1

2

3

4              UNITED STATES DISTRICT COURT

5           FOR THE EASTERN DISTRICT OF CALIFORNIA

6

7  COALITION FOR A SUSTAINABLE DELTA        1:09-cv-2024 OWW DLB
   and KERN COUNTY WATER AGENCY
8                                           MEMORANDUM DECISION RE
9              Plaintiffs,                  FEDERAL DEFENDANTS' MOTION
                                            TO DISMISS (DOC. 102)
10        v.

11 FEDERAL EMERGENCY MANAGEMENT AGENCY
   and WILLIAM CRAIG FUGATE, in his
12 official capacity as Administrator
   of the Federal Emergency Management
13 Agency,

14
               Defendants.
15

16                    I. INTRODUCTION

17      The Federal Emergency Management Agency and its

18 Administrator, William C. Fugate ("FEMA" or "Federal Defendants")

19 move to dismiss Counts 14, 15, and 16[1] of the Second Amended

20 Complaint ("SAC") pursuant to Federal Rule of Civil Procedure

21 12(b)(1) on the grounds that Plaintiffs lack Article III

22 standing.  Doc. 102.  Plaintiffs, the Coalition for a Sustainable

23 Delta ("Coalition") and Kern County Water Agency ("KCWA"), oppose

24 dismissal.  Doc. 110.  FEMA filed a reply.  Doc. 115.  Oral

25 argument was heard April 26, 2010.

26

27 ─────────────────
        [1] These three claims were severed from the remaining claims in the SAC,
28 which challenged actions by several other federal agencies.  See Doc. 100.

                              1

PDF created with pdfFactory trial version www.pdffactory.com

## II. BACKGROUND

A.   <u>General Overview of the Case.</u>

This case involves a challenge to FEMA's administration of the National Flood Insurance Program ("NFIP") in the Sacramento-San Joaquin Delta ("Delta").  The Coalition is a California corporation that represents the interests of entities and individuals that use Delta water for agricultural purposes.  KCWA is a California state agency that contracts for Delta water on behalf of individual water districts in Kern County.  Both Plaintiffs allege that they depend on Delta water from the California State Water Project ("SWP") and the Central Valley Project ("CVP), two of the largest water distribution systems in California.

The SAC was filed on July 23, 2009 against numerous federal agencies, challenging a number of federal activities in and around the Delta.  The claims against FEMA, asserted in Claims 14-16 of the SAC, were severed from the remaining claims in the SAC.  In Claims 14-16, Plaintiffs allege that FEMA's administration of the NFIP encourages development in the Delta, which adversely affects four species listed as threatened or endangered under the Endangered Species Act ("ESA"):  the delta smelt, the Sacramento River winter-run Chinook salmon, the Central Valley spring-run Chinook salmon, and the Central Valley steelhead (collectively the "Listed Species").  Plaintiffs further allege that FEMA is administering the NFIP in violation

2

PDF created with pdfFactory trial version www.pdffactory.com

of ESA Section 7, which requires federal agencies to insure, in consultation with the U.S. Fish and Wildlife Service ("FWS") in the case of listed terrestrial and inland fish species such as the delta smelt and the National Marine Fisheries Service ("NMFS") in the case of listed marine and anadromous fish species including listed salmonids, that their actions do not jeopardize the continued existence of any listed species or destroy or adversely modify critical habitat. *See* 16 U.S.C. § 1636(a)(2).

B.   Endangered Species Act.

The ESA provides for the listing of species as threatened or endangered. 16 U.S.C. § 1533. ESA Section 7 directs each federal agency to insure, in consultation with FWS or NMFS (the "consulting agency"), that "any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2). If the agency proposing the action ("action agency") determines that the action "may affect" listed species or critical habitat, the action agency must pursue either informal or formal consultation with the consulting agency. 50 C.F.R. §§ 402.13-402.14. Formal consultation is required unless the action agency determines, with the consulting agency's written concurrence, that the proposed action is "not likely to adversely affect" a listed species or critical habitat. §§ 402.14(b)(1),

3

402.13(a).  If formal consultation is required, the consulting

agency must prepare a biological opinion stating whether the

proposed action is likely to "jeopardize the continued existence

of" any listed species or destroy or adversely modify critical

habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

C.   The National Flood Insurance Act and Program.

     The purpose of the National Flood Insurance Act of 1968

("NFIA") is to provide affordable flood insurance to the general

public and reduce the risks and costs of flood damage.  42 U.S.C.

§§ 4001(d)-(f), 4011, 4014; *Flick v. Liberty Mut. Fire Ins. Co.*,

205 F.3d 386, 388 (9th Cir. 2000).  To achieve these objectives,

the NFIA authorizes FEMA to establish and carry out the NFIP.  42

U.S.C. §§ 4001(a), 4011, 4128.

     The NFIA directs FEMA to make flood insurance available in

communities that have (1) evidenced interest in securing flood

insurance through the NFIP and (2) adopted adequate flood plain

management regulations consistent with criteria developed by

FEMA.  §§ 4012(c), 4022(a); 44 C.F.R. § 60.1(a).  The NFIA

mandates that FEMA design the criteria to encourage, to the

maximum extent feasible, the adoption of state and local flood

plain regulations that will:

              (1) constrict the development of land which is exposed
              to flood damage where appropriate,

              (2) guide the development of proposed construction away
              from locations which are threatened by flood hazards,

4

PDF created with pdfFactory trial version www.pdffactory.com

(3) assist in reducing damage caused by floods, and

(4) otherwise improve the long-range land management and use of flood-prone areas.

42 U.S.C. § 4102(c).  FEMA promulgated regulations setting forth the community eligibility criteria in 1976.  41 Fed. Reg. 46,975 (Oct. 26, 1976); 44 C.F.R. §§ 60.1-60.26.  Flood insurance is marketed in eligible communities either directly by FEMA or through arrangements with private sector property insurance companies.  *See* 44 C.F.R. § 62.23(a); 42 U.S.C. § 4081.

The NFIA also directs FEMA to implement a "community rating system program" that provides discounts on flood insurance premiums in communities that establish additional floodplain management regulations that exceed FEMA's minimum eligibility criteria.  42 U.S.C. § 4022(b).  Participation in the community rating system program is entirely voluntary.  *Id.*

Finally, the NFIA directs FEMA to undertake certain activities peripheral to the NFIP, such as the preparation of maps of the floodplain.  The NFIA directs FEMA to "identify and publish information with respect to all floodplain areas, including coastal areas located in the United States," 42 U.S.C. § 4101(a), and update the maps as provided in the statute, § 4101(e)-(i).  The mapping activity is based solely on technical evaluation of the base flood elevation and effectively involves drawing a topographic line around the floodplain.  *See, e.g.*, § 4104; 44 C.F.R. § 64.3, 65.1-65.17.

5

PDF created with pdfFactory trial version www.pdffactory.com

### III. STANDARD OF DECISION

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for "lack of jurisdiction over the subject matter." Faced with a Rule 12(b)(1) motion, a plaintiff bears the burden of proving the existence of the court's subject matter jurisdiction. *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996). A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears. *Gen. Atomic Co. v. United Nuclear Corp.*, 655 F.2d 968, 968-969 (9th Cir. 1981).

A challenge to subject matter jurisdiction may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). As explained in *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038 (9th Cir. 2004), cert. denied, 544 U.S. 1018 (2005):

> In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.

In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *Savage v. Glendale Union High School*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003), cert. denied, 541 U.S. 1009 (2004); *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988), cert. denied, 489 U.S. 1052 (1989). "If the challenge to jurisdiction is a facial

6

PDF created with pdfFactory trial version www.pdffactory.com

attack, i.e., the defendant contends that the allegations of jurisdiction contained in the complaint are insufficient on their face to demonstrate the existence of jurisdiction, the plaintiff is entitled to safeguards similar to those applicable when a Rule 12(b)(6) motion is made." *Cervantez v. Sullivan*, 719 F. Supp. 899, 903 (E.D. Cal. 1989), rev'd on other grounds, 963 F.2d 229 (9th Cir. 1992). "The factual allegations of the complaint are presumed to be true, and the motion is granted only if the plaintiff fails to allege an element necessary for subject matter jurisdiction." *Id.*

The standards used to resolve motions to dismiss under Rule 12(b)(6) are relevant to disposition of a facial attack under 12(b)(1). *See Cassirer v. Kingdom of Spain*, 580 F.3d 1048, 1052 n.2 (9th Cir. 2009) (applying *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) to a motion to dismiss for lack of subject matter jurisdiction). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To sufficiently state a claim to relief and survive a 12(b)(6) motion, the pleading "does not need detailed factual allegations" but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Mere "labels and conclusions" or a "formulaic recitation of the

7

elements of a cause of action will not do." *Id*.   Rather, there
must be "enough facts to state a claim to relief that is
plausible on its face." *Id*. at 570.   In other words, the
"complaint must contain sufficient factual matter, accepted as
true, to state a claim to relief that is plausible on its face."
*Iqbal*, 129 S. Ct. at 1949 (internal quotation marks omitted).
The Ninth Circuit has summarized the governing standard, in light
of *Twombly* and *Iqbal*, as follows: "In sum, for a complaint to
survive a motion to dismiss, the non-conclusory factual content,
and reasonable inferences from that content, must be plausibly
suggestive of a claim entitling the plaintiff to relief."   *Moss
v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal
quotation marks omitted).

   The *Twombly/Iqbal* standard as articulated in *Moss* is
consistent with Ninth Circuit precedent requiring, "[t]he party
seeking to invoke the jurisdiction of the federal Courts" to
allege at the pleading stage "specific facts sufficient to
satisfy" all of the elements of standing for each claim he seeks
to press.   *Schmier v. U.S. Court of Appeals for Ninth Circuit*,
279 F.3d 817, 821 (9th Cir. 2002).   "A federal court is powerless
to create its own jurisdiction by embellishing otherwise
deficient allegations of standing."   *Whitmore v. Arkansas*, 495
U.S. 149, 155-56, (1990).   "It is a long-settled principle that
standing cannot be inferred argumentatively from averments in the

8

PDF created with pdfFactory trial version www.pdffactory.com

pleadings." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). "The facts to show standing must be clearly apparent on the face of the complaint." *Baker v. United States*, 722 F.2d 517, 518 (9th Cir. 1983). However, contrary to Federal Defendant's assertions, the factual allegations need not be made with particularity beyond that required by *Twombly/Iqbal*. Applying *Moss*, 572 F.3d at 969, standing may be based on "non-conclusory factual content, and reasonable inferences from that content," in the complaint that are "plausibly suggestive" of the existence of standing.[2]

## IV. <u>ANALYSIS</u>

A.   <u>General Legal Standard Re: Standing.</u>

Standing is a judicially created doctrine that is an essential part of the case-or-controversy requirement of Article III. *Pritikin v. Dept. of Energy*, 254 F.3d 791, 796 (9th Cir. 2001). "To satisfy the Article III case or controversy

---

[2] Plaintiffs point to somewhat contradictory language in *Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)*, which held: "general factual allegations of injury resulting from the defendant's conduct may suffice," at the pleading stage. *See also Bennett v. Spear*, 520 U.S. 154, 171 (1997)(explaining that at the pleading stage a plaintiff's burden is "relatively modest"). But, these holdings, issued before the Supreme Court's paradigm-shifting ruling in *Iqbal*, are not inconsistent with the approach taken in *Moss*, in which the Ninth Circuit articulated how to apply *Iqbal* in practice.

At the same time, *Iqbal* does not require specificity on the order of that required under Rule 9. To survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 129 S. Ct. at 1949. Thus, while something more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are required, "the pleading standard Rule 8 announces does not require 'detailed factual allegations.'" *Id*. (emphasis added).

9

requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc. v. Heckler*, 464 U.S. 67, 70 (1984). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

The doctrine of standing "requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984). The court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing. *Whitmore*, 495 U.S. at 155-56; *Schmier*, 279 F.3d at 821. To have standing, a plaintiff must show three elements.

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted).

The Supreme Court has described a plaintiff's burden of proving standing at various stages of a case as follows:

> Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the

10

PDF created with pdfFactory trial version www.pdffactory.com

plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id.* at 561; *see also Churchill County v. Babbitt*, 150 F.3d 1072, 1077 (9th Cir. 1998).

In addition, where an organization or association is bringing suit on behalf of its members, that organization or association must demonstrate that: (1) its members would otherwise have standing to sue in their own right; (ii) the interests it seeks to protect are germane to the organization's purpose; and (iii) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Standing is evaluated on a claim-by-claim basis. "A plaintiff must demonstrate standing 'for each claim he seeks to press' and for 'each form of relief sought.'" *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

11

PDF created with pdfFactory trial version www.pdffactory.com

1   "[S]tanding is not dispensed in gross...."  *Lewis v. Casey*, 518

2   U.S. 343, 358, n.6 (1996).

3           The actual-injury requirement would hardly serve the
4           purpose ... of preventing courts from undertaking tasks
            assigned to the political branches[,] if once a
5           plaintiff demonstrated harm from one particular
            inadequacy in government administration, the court were
6           authorized to remedy all inadequacies in that
            administration.

7   *Id.* at 357.  Plaintiffs must therefore demonstrate standing for

8   each aspect of FEMA's administration of NFIP that they seek to

9   challenge, including FEMA's develop[ment of] the minimum

10  eligibility criteria" in 1976, "determining whether communities

11  satisfy such criteria, updating maps, ... administering the

12  community rating system," and issuing or authorizing the issuance

13  of flood insurance.  SAC ¶¶ 216, 199-203, 209, 221.

14

15

16

17  B.   Summary of Relevant Allegations in the SAC.

18       1.   Allegations Regarding the Impact of the FEMA Flood
              Insurance Program on the Listed Species.

19       The SAC alleges that numerous factors are currently

20  contributing to the decline of the Delta and the Listed Species

21  that live in, migrate through, or otherwise depend on the Delta

22  for their survival and continued existence.  SAC ¶3.

23  Discretionary actions and programs implemented by FEMA and other

24  federal agencies may have adverse effects on the Listed Species

25  and their critical habitat within the Delta.  SAC ¶6.  Plaintiffs

26  contend that FEMA has undertaken certain activities in violation

27

28                                  12

PDF created with pdfFactory trial version www.pdffactory.com

of Section 7(a) of the ESA, by failing to consult with FWS and/or NMFS.  *Id.*

FEMA administers the NFIP, which offers subsidized flood insurance to property owners in eligible local communities.  SAC ¶¶ 10, 197-203.  It is alleged that this subsidized flood insurance leads to additional development in the flood-prone areas of the Delta.  SAC ¶¶ 10, 204.  Development in the Delta adversely impacts on the Listed Species by reducing habitat and increasing urban runoff that may be contaminated with substances harmful to the Listed Species.  SAC ¶¶ 10, 52, 206-208.

Under the NFIP, local communities only become eligible for flood insurance once they have adopted "adequate land use and control measures" that are consistent with criteria developed by FEMA.  SAC ¶197.  The criteria are designed to reduce threats to lives and to minimize damage to structures and water systems; they do not address aquatic habitat, threatened or endangered species, or other environmental values.  SAC ¶200.

FEMA regulates NFIP-participating communities to ensure that they are complying with the program and its eligibility requirements.  SAC ¶202.  FEMA conducts community visits to assess local programs and provide technical assistance to local officials.  If a community fails to enforce minimum land-use regulations, FEMA may place the community on probation or suspend its participation in the Flood Insurance Program.  *Id.*  The NFIA

13

PDF created with pdfFactory trial version www.pdffactory.com

prohibits other federal agencies from providing loans to property owners in communities that do not participate in the NFIP. SAC ¶204. Federally-regulated banks are also prohibited from making, increasing, extending, or renewing any loan secured by property located within a floodplain area unless that property is covered by flood insurance. *Id*. Thus, the SAC alleges, development within flood-prone areas is inextricably tied to participation in the NFIP. *Id*.

FEMA further promotes development by providing discounted flood insurance to communities that adopt land-use regulations that go beyond NFIP eligibility requirements. SAC ¶¶ 203, 210. These discounts are granted by a Community Rating System implemented by FEMA which "also rewards activities that are detrimental to floodplains and aquatic species." SAC ¶203, quoting *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, 345 F. Supp. 2d 1151, 1157 (W.D. Wash. 2004).

Currently, there are 15 communities in the Delta that participate in the NFIP. SAC ¶205. In 2007, the Public Policy Institute of California estimated that over 130,000 new homes were in the planning stages in the Delta. SAC ¶206. In the years since the listing of the Listed Species, FEMA has issued hundreds of new individual flood insurance policies for new structures within floodplains utilized by and relied upon by the Listed Species, without consulting with the Fish and Wildlife

14

PDF created with pdfFactory trial version www.pdffactory.com

Service or the National Marine Fisheries Service.  SAC ¶205.
FEMA also continues to revise flood maps, assure community
compliance, and review local regulations under the NFIP without
consulting under the ESA.  *Id.*

The SAC alleges that FEMA's actions under the NFIP impact
the Listed Species by leading to increased development, which (a)
destroys the habitat of the Listed Species by converting tidal
wetlands to upland development, and (b) increases wastewater and
urban runoff from lawns, sidewalks, and roads, which contains
pesticides and other contaminants that harm the Listed Species.
SAC ¶¶ 207-208, 210.  Further, land use activities associated
with the increased development, such as road construction,
recreation, and agriculture, have significantly altered fish
habitat quantity and quality by modifying stream bank and channel
morphology, altering water temperatures, and eliminating spawning
and rearing habitat.  SAC ¶208.

> 2.  <u>Allegations Regarding the Interest of the Coalition for
> a Sustainable Delta and Injury to Coalition Members
> from FEMA's Actions.</u>

According to the SAC, the Coalition is comprised of
individual and agricultural water uses and of individuals in the
San Joaquin Valley and brings the action on behalf of the
Coalition and its members.  SAC ¶16.  The Coalition and its
members allegedly depend on water from the Delta to support their
livelihoods and economic well-being.  *Id.*  The complaint further

15

PDF created with pdfFactory trial version www.pdffactory.com

alleges that the Purposes of the Coalition are to (1) better the conditions of those engaged in agricultural pursuits in the San Joaquin Valley and (2) ensure a sustainable and reliable water supply by protecting the Delta and promoting a strategy to ensure its sustainability. *Id.*

Certain Coalition members have contracts for delivery of water from the SWP and rely on the deliveries of water from the Delta. SAC ¶17. Accordingly, the Coalition alleges that its members claim to have a long-term interest in the overall health of the Delta and its ecosystem, including the maintenance of viable populations of the Listed Species. *Id.* In addition, reduced deliveries of water from the SWP will result in overdraft of the groundwater basins that underlie the lands of Coalition members. SAC ¶18. The SAC alleges that reduced water availability and reduced deliveries of SWP water have economic impacts on members of the Coalition because such members are required to pay for the full contractual entitlement, even if the entitlement is not delivered and because the members must develop other sources of water for irrigation of their crops or forego irrigation altogether thus impacting their livelihood. *Id.*

The Coalition also claims that its members view, enjoy, and use the Delta ecosystem by routinely engaging in various recreational activities in the Delta, including boating, fishing, and wildlife viewing, and have concrete plans to continue to do

16

so in the future.  SAC ¶19.  It is alleged that Coalition members derive significant use and enjoyment from the aesthetic, recreational, and conservation benefits of the Delta ecosystem, including the delta smelt and other Listed Species, and that the decline of the Listed Species has had and continues to have a substantial negative impact on Coalition members, impairing their use and enjoyment of the Delta and the Listed Species.  *Id.*

>    3.   Allegations Regarding the Interest of and Injury to KCWA from FEMA's Actions.

KCWA is a public agency charged by the California Legislature with the power to acquire and contract for water supplies for Kern County.  SAC ¶21.  KCWA provides a portion of and in some cases the entire water supply for approximately 719,000 acres of farmland and 500,000 residents of Kern County. KCWA depends on SWP deliveries from the Delta for 98 percent of its water supply.  SAC ¶23.  The operation of the State Water Project is, in turn, dependent on the overall health of the Delta and its ecosystem, which includes the maintenance of viable populations of species living in the Delta and protected by the ESA, including the Listed Species.  *Id.*  The SAC alleges that FEMA's ESA violations have injured KCWA by reducing the amount of water available to KCWA.  SAC ¶24.

C.   Economic/Water Supply Injury Theory of Standing.

>    1.   Injury-In-Fact.

17

Federal Defendants concede that Plaintiffs' allegations that FEMA's administration of the NFIP provides an "incentive" for third parties to engage in development, recreation, and agriculture that adversely affect the Listed Species must be assumed true for purposes of a facial 12(b)(1) challenge. Nevertheless, Federal Defendants maintain that Plaintiffs have failed to allege how the operation of any such incentive translates into economic injury to the plaintiffs themselves. "The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff." *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (emphasis added). "[T]he injury that a plaintiff alleges must be unique to that plaintiff, one in which he has a 'personal stake' in the outcome of a litigation seeking to remedy that harm." *Schmier*, 279 F.3d at 821. "In addition, the plaintiff must have sustained a concrete injury, distinct and palpable ... as opposed to merely abstract.... And that injury must have actually occurred or must occur imminently; hypothetical, speculative or other possible future injuries do not count in the standings calculus." *Id.* (internal citations and quotations omitted).

    a.    <u>Sufficiency of Allegations of Economic Harm.</u>

Federal Defendants argue that Plaintiffs claims of economic injury are insufficient.  The SAC alleges that KCWA and

18

unidentified Coalition members have suffered monetary harm as a result of a reduction in the availability of Delta water.  SAC ¶¶ 16-18, 21-24.  Specifically, KCWA alleges that it "has a contract with the State of California for a supply of water from the SWP," SAC ¶77, and that "KCWA's contract for delivery of SWP water requires payment for its full contract amount regardless of the amount of water actually delivered in any given year through the SWP," SAC ¶22.  Like KCWA, the Coalition alleges that some of the unidentified contracts for SWP water held by its members "require payment for their full contractual entitlement regardless of the amount of water actually delivered in any given year through the SWP," and that "[r]educed water availability and reduced deliveries of SWP water have an economic impact on members of the Coalition because such members are required to pay for the full contractual entitlement, even if the entitlement is not delivered and because the members must develop other sources of water for irrigation of their crops or forego irrigation altogether thus impacting their livelihood," with additional adverse consequences.  SAC ¶18.

Federal Defendants complain, however, that neither KCWA nor the Coalition allege any of its members have <u>actually</u> paid their full contract amount in any particular year, despite not receiving its full entitlement of SWP water, due to some particular action of the federal government.  Nor do Plaintiffs

19

allege that such a scenario is imminent.  Federal Defendants insist that to establish the requisite "personal stake in the outcome," the Supreme Court has "required Plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm."  *Summers v. Earth Island Institute*, 129 S. Ct. 1142, 1151-52 (2009).

Federal Defendants rely on *Bennett v. Spear*, 520 U.S. 154 (1997), in which plaintiffs challenged FWS's biological opinion regarding the Bureau of Reclamation's operation of the Klamath Irrigation Project.  The biological opinion identified certain reasonable and prudent alternatives that would avoid jeopardy, including maintaining minimum water levels in the reservoirs from which Plaintiffs "currently receive[d] irrigation water."  *Id.* at 159, 167.  It was specifically alleged that the restrictions imposed in the biological opinion "adversely affect [plaintiffs] by substantially reducing the quantity of available irrigation water."  *Id.* at 167.

Federal Defendants maintain that the SAC's "vague allegations bear no resemblance to the specific allegations of immediate harm advanced by the plaintiffs in Bennett," noting that the Coalition merely alleges that "[c]ertain Coalition members have contracts with various agencies for the delivery of SWP and CVP water" and that "[c]ertain Coalition members' contracts for delivery of SWP water require payment for their

20

PDF created with pdfFactory trial version www.pdffactory.com

full contractual entitlement regardless of the amount of water actually delivered in any given year through the SWP." Doc. 115 at 6 (citing SAC ¶¶ 17-18). Federal Defendants seem to be demanding that the complaint: (a) identify the names of specific members of the Plaintiff organizations, (b) describe the nature of these members' contracts for water from the Delta, and (c) allege that these members actually received reduced water deliveries under their contracts due to some specific action of FEMA, or that such a scenario is imminent.

First, it is not necessary to identify specific names of members at the pleading stage. *See NW Envt'l Defense Ctr v. Brown*, 476 F. Supp. 2d 1188, 1192 (D. Or. 2007) (finding sufficient general allegations that organization's members use the bodies of water in question for recreation and that at least one member has been injured by defendant's conduct and acknowledging that the vast majority of cases requiring individual members to come forward were decided on motions for summary judgment.).

Second, although "[a]llegations of possible future injury do not satisfy the requirements of Art[icle] III," *Whitmore*, 495 U.S. at 158, Plaintiffs need not show actual harm; "an increased risk of harm can itself be injury in fact sufficient for standing," *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000); *see also Ocean Advocates v. U.S. Army*

21

*Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2004).  *In Ocean Advocates*, the U.S. Army Corps of Engineers authorized the expansion of an oil refinery dock without first preparing an environmental impact statement pursuant to the National Environmental Policy Act.  *Id.* at 855.  The Ninth Circuit concluded that plaintiffs, who expressed aesthetic and environmental concerns for the affected area, demonstrated injury in fact because the dock extension would result in increased traffic, which would increase the potential for an oil spill, and an "oil spill would cause a markedly decreased opportunity for [plaintiffs] to study the ecological area, observe wildlife, and use Cherry Point for recreation."  *Id.* at 859-60.  To "'require actual evidence of environmental harm, rather than an increased risk ...would unduly limit the enforcement of statutory environmental protections."  *Id.* (quoting *Ecological Rights Found.*, 230 F.3d at 1151)).

In general, the allegations in the SAC satisfy this requirement by alleging that KCWA and Coalition members rely on water from the Delta for their livelihood and economic well-being.  SAC ¶¶ 16-17, 21-23.  KCWA and Coalition members hold contracts for the delivery of water from the Delta that require payment for the full contractual entitlement regardless of the amount of water actually delivered in any given year.  SAC ¶¶ 18, 22.  The Complaint also alleges that the combined operation of

22

the Projects is dependent on the overall health of the Delta and its ecosystem, which includes the maintenance of viable populations of the Listed Species.  SAC ¶23.  Further, it is alleged that FEMA's implementation and enforcement of the Flood Insurance Program has contributed to the decline of the Listed Species, SAC ¶¶ 6, 10, 52, 197-210, which in turn injures Plaintiffs by contributing to conditions that require reductions in the Projects' water supply and in the amount of water available to Plaintiffs, SAC ¶¶ 18, 24.

b.   <u>KCWA's Status as a Wholesaler.</u>

However, Federal Defendants also argue that allegations in the complaint concerning KCWA actually contradict their assertions of economic harm.  Specifically, KCWA alleges that it is a "wholesaler of SWP water for both agricultural and municipal and industrial uses.  KCWA contracts with 13 separate water districts in Kern County, which supply SWP water directly to water users for agricultural use."  SAC ¶ 21.  In other words, KCWA is not an end-user of SWP water, nor does it purport to represent the agencies with which it contracts.  The SAC does not indicate whether the costs of KCWA's contract with DWR are passed on to the 13 individual water districts -- in which case KCWA itself would never suffer any monetary injury under its contract with DWR regardless of how much SWP water it receives in any particular year.  *See Kern County Water Agency v. Belridge Water*

23

PDF created with pdfFactory trial version www.pdffactory.com

*Storage Dist.*, 18 Cal. App.4th 77, 22 Cal. Rptr. 2d 354, 355 (Cal. App. 5 Dist.,1993) (noting that "[t]he water supply contracts [between KCWA and the member districts] are substantially identical and each expressly incorporated by reference the terms of the Master Contract [between KCWA and DWR]").[3]  While the member districts who actually pay for the water might suffer some type of economic harm if the amount of water delivered under the DWR-KCWA contract is reduced (assuming the districts do not further pass on their costs to end-users), the SAC suggests KCWA itself does <u>not</u> suffer any type economic injury, absent allegations to the contrary such as KCWA being charged for water it does not receive, which charge is not passed on to its districts.

However, in addition to allegations of economic harm, KCWA alleges that its central purpose is to acquire and contract for water supplies for the different water districts in Kern County and that reduced water availability threatens KCWA's ability to serve its central function.  This stand-alone allegation of injury is unaffected by KCWA's status as a wholesaler.

---

[3] Federal Defendants further complain that the SAC does not disclose the purported amount of any alleged monetary loss KCWA has suffered or imminently will suffer due to any purported federal interference with its DWR contract. Federal Defendants suggest that such "specific facts" are required to defeat a motion to dismiss on standing grounds.  This reads too much into the standing pleading requirements.  Federal Defendants fail to point to any authority that requires this level of specificity.  It is sufficient that the "non-conclusory factual content, and reasonable inferences from that content," are "plausibly suggestive" of the existence of a financial injury.  *See Moss*, 572 F.3d at 969.

PDF created with pdfFactory trial version www.pdffactory.com

1    The Coalition and KCWA satisfy the injury-in-fact

2    requirement.

3

4        2.   Causation & Redressibility.

5            a.   Relaxed Standard in Procedural Injury Cases.

6    When a plaintiff seeks to vindicate a procedural harm,

7    rather than a substantive right, the causation and redressibility

8    requirements are relaxed:

9            A showing of procedural injury lessens a plaintiff's
             burden on the last two prongs of the Article III
10           standing inquiry, causation and redressibility.
             Plaintiffs alleging procedural injury must show only
11           that they have a procedural right that, if exercised,
             could protect their concrete interests.
12

13   Salmon Spawning & Recovery Alliance v. Gutierrez, 545 F.3d 1220,

14   1226 (9th Cir. 2008) (emphasis in original) (internal citations

15   and quotations omitted).

16       Defenders of Wildlife v. EPA, 420 F.3d 946, 957-58 (9th Cir.

17   2005) ("DOW v. EPA"), reversed on other grounds by National

18   Association of Home Builders v. Defenders of Wildlife, 551 U.S.

19   644 (2007), applied this relaxed standard to a claim brought

20   under the ESA alleging lack of adequate consultation under

21   Section 7(a)(2).  One ground for challenge of the consultation

22   process in DOW v. EPA was that the action agency relied on a

23   "legally improper Biological Opinion."  Id.  The Ninth Circuit

24   concluded that plaintiffs had standing to challenge the agency

25   action because "the use of an improper section 7 consultation by

26   reason of an inadequate biological opinion lessens the likelihood

27

28

                                   25

that the impact of the proposed action on listed species and

their habitats will be recognized and accounted for in making the

transfer decision." *Id.* at 958.  The Ninth Circuit categorized

as "procedural" a section 7(a)(2) claim that the action agency

improperly relied upon an inadequate biological opinion.

Likewise, the failure to engage in the Section 7 consultation

process is "procedural."

But, the reach of this relaxed standard has limits, <u>excusing</u>
<u>a plaintiff only from the requirement to plead that the</u>
<u>procedurally invalid agency action will, in fact, be modified</u>
<u>once the proper procedures are followed</u>:

> There is this much truth to the assertion that
> "procedural rights" are special:  The person who has
> been accorded a procedural right to protect his
> concrete interests can assert that right without
> meeting all the normal standards for redressability and
> immediacy.  Thus, under our case law, one living
> adjacent to the site for proposed construction of a
> federally licensed dam has standing to challenge the
> licensing agency's failure to prepare an environmental
> impact statement, even though he cannot establish with
> any certainty that the statement will cause the license
> to be withheld or altered, and even though the dam will
> not be completed for many years. (That is why we do not
> rely, in the present case, upon the Government's
> argument that, even if the other agencies were obliged
> to consult with the Secretary, they might not have
> followed his advice.)

*Lujan*, 504 U.S. at 573 n.7 (1992).

Similarly, in *Summers*, plaintiffs claimed that the Forest

Service deprived them of their alleged statutory right to comment

on a timber sale.  The Supreme Court held that plaintiffs

adequately alleged standing to challenge the project by "claiming

26

PDF created with pdfFactory trial version www.pdffactory.com

that but for the allegedly unlawful abridged procedures they would have been able to oppose the project that threatened to impinge on their concrete plans to observe nature in that specific area." 129 S. Ct. at 1151. In cases involving procedural injuries the normal standards for redressability and immediacy may be relaxed such that "standing existed with regard to the [project,] for example, despite the possibility that [plaintiff's] allegedly guaranteed right to comment would not be successful in persuading the Forest Service to avoid impairment of Earth Island's concrete interests." *Id.*; *see also Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226-27 (9th Cir. 2008) (noting that "[p]laintiffs alleging procedural injury can often establish redressibility with little difficulty, because they need to show only that the relief requested -- that the agency follow the correct procedures -- <u>may</u> influence the agency's ultimate decision of whether to take or refrain from taking a certain action") (emphasis added).

Under these cases, it may be assumed at the pleading stage, that, if Plaintiffs' succeed, FEMA would have to change the manner in which it administers the NFIP; that the change would lead third-party developers to change or limit their development activities; and that this change would lessen the alleged adverse impacts of development on listed species in the Delta. However, <u>Plaintiffs' claimed injuries are allegedly caused by water</u>

PDF created with pdfFactory trial version www.pdffactory.com

restrictions imposed by the consulting agencies as a result of a wholly independent administrative process: the ESA consultation between the Bureau of Reclamation and the consulting agencies on coordinated CVP and SWP operations.   SAC ¶¶ 5 82-87, 118-127; Pl.'s Opp. at 13-14.   The relaxed immediacy and redressability standards in procedural injury cases "presume that the defendant agency has the authority and ability to redress the plaintiff's ultimate injury."   *Goat Ranchers of Oregon v. Williams*, 2009 WL 883581, at *2, *10 (D. Or. March 30, 2009).   "The redressability requirement is not toothless in procedural injury cases."   *Id.* (quoting *Salmon Spawning*, 545 F.3d at 1227).   "There must still be some possibility that granting the requested relief will have an effect on the ultimate injury alleged."   *Id.* (citing *Salmon Spawning*, 545 F.3d at 1227).

In standard (i.e., non procedural-injury) cases, "[t]here is no redressability, and thus no standing, where ... any prospective benefits depend on an independent actor who retains broad and legitimate discretion the courts cannot presume either to control or to predict."   *Glanton v. Advancepcs Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006).   Nothing in the procedural-injury jurisprudence relaxes this rule.   *See Nuclear Information Resource Service v. Nuclear Regulatory Commission*, 457 F.3d 941, 955 (9th Cir. 2006) ("*NIRS*").   In *NIRS*, the plaintiffs challenged the NRC's decision to revise regulations governing the exemption

28

standards for the transportation of radioactive material.

Plaintiffs alleged that NRC failed to comply with its procedural

obligations under NEPA.  NRC objected that the plaintiffs'

procedural injuries were not redressable because the Department

of Transportation ("DOT") had promulgated identical exemption

standards that would be unaffected by the lawsuit.  The Ninth

Circuit agreed with NRC and held that plaintiffs lacked standing:

> The parties agreed at oral argument that NRC licensees
> are required to follow DOT's regulations for the
> transportation of nuclear material....  Thus, even if
> we were to set aside the current NRC rule and remand to
> NRC with instructions that it prepare an EIS, nothing
> requires DOT to revisit its identical exemption
> standards, which govern the universe of NRC
> licensees.... [T]he DOT rule would control even if the
> NRC rule was wiped off the books.  And the DOT
> regulation is not before us.  We cannot see how an
> order remanding to NRC would remedy the asserted injury
> from the ... exemption standards because DOT would be
> under no obligation to reconsider its own, identical
> rule.

*NIRS*, 457 F.3d at 955; *see also Center for Law & Educ.* v. Dept.

of Educ., 396 F.3d 1152, 1160-61 (D.C. Cir. 2005) (causal chain

between alleged procedural violation and injury too attenuated

where injury was the result of regulatory action by the State of

Illinois permitted but not required by federal agency against

whom suit was brought).

Similarly, in *Renee v. Duncan*, 573 F.3d 903 (9th Cir. 2009),

California public school students and their parents challenged

the Secretary of Education's regulation allowing teachers who

participated in "alternative route programs" to be considered

"highly qualified" under the No Child Left Behind Act.  However,

29

PDF created with pdfFactory trial version www.pdffactory.com

the Act itself also defines "highly qualified" to include a

teacher who is fully certified under state law.  *Id.* at 906.

California's regulations allow participants in alternative route

programs to achieve full certification status -- and thus be

"highly qualified" under the Act -- regardless of the validity of

the challenged federal regulation.  *Id.* at 910.  The Ninth

Circuit held that plaintiffs' injuries would not be redressed by

a favorable decision setting aside the federal regulation:

> Because it is undisputed that the interpretation of
> "full State certification" is a matter of state law and
> that, therefore, a state can essentially decide what
> constitutes a "highly qualified teacher," it is
> unlikely that the revocation of the regulation will
> have a "coercive effect" upon California.  Instead,
> appellants' injury is likely the result of California's
> independent action who is not before the court.
> Accordingly, appellants have failed to meet their
> burden of establishing redressability.

*Id.* at 911 (internal citation and quotations omitted); *Levine*,

587 F.3d at 991-997 (no standing where redressability depended on

"independent decision" by agency-defendant which "may be subject

to a number of political and legal factors quite independent

from" the court's ruling).

     However, causation/redressibility may be shown if "a causal

relation[ship] is 'probable'..., even if the chain cannot be

definitively established."  *Envtl. Def. Ctr. v. EPA*, 344 F.3d

832, 867 (9th Cir. 2003); *see also Coalition v. Koch*, 2009 WL

2151842, at *13 n.6 (E.D. Cal. Jul. 16 2009)("So long as there is

evidence that the third party, whether possessing a four-

chambered heart or not, will behave in a <u>predictable manner</u>, the

30

causal chain is not necessarily rendered 'tenuous' for the

purposes of the standing analysis.")(emphasis added); *see also*

*Loggerhead Turtle v. City Council*, 148 F.3d 1231, 1247 (11th Cir.

1998) ("standing is not defeated merely because the alleged

injury can be fairly traced to the actions of both parties and

non-parties" (citing *Lujan*, 504 U.S. at 560)).

In *National Audubon Society v. Davis*, 307 F.3d 835 (9th Cir.

2002), relied upon in *Koch*, bird enthusiasts alleged that a

California law banning the use of leghold traps to capture or

kill wildlife violated the Migratory Bird Treaty Act.  *Id*. at

842-843.  Prior to the passage of that California law, federal

officials used leghold traps against predators to protect several

bird species.  *Id*. at 844.  The Ninth Circuit held that

plaintiffs had standing to challenge the leghold trap ban,

finding their injury was "fairly traceable" to the proposition

because:

> [T]he federal government removed traps in direct
> response to Proposition 4 (whether under direct "threat
> of prosecution" or not). Removal of the traps leads to
> a larger population of predators, which in turn
> decreases the number of birds and other protected
> wildlife.

*Id*. at 849.  "This chain of causation has more than one link, but

it is not hypothetical or tenuous; nor do appellants challenge

its plausibility."  *Id*.

Here, Plaintiffs challenge FEMA's administration of the NFIP

and related programs, and assert alleged harm, in the form of

31

PDF created with pdfFactory trial version www.pdffactory.com

reduced water deliveries, caused by an entirely separate regulatory action.  Plaintiffs have pointed to no legal authority suggesting that the regulators of the CVP and SWP are under any legal obligation to change their regulatory actions if FEMA is forced to engage in ESA Section 7 consultation.

Plaintiffs' alleged injury is reduced water deliveries due to the biological opinions issued in connection with the joint operation of the CVP and SWP.  As Federal Defendants acknowledge, for the purposes of this motion to dismiss, the court must assume: (a) Plaintiffs will succeed on the merits of their claims against FEMA; (b) FEMA will engage in section 7 consultation which will result in modifications to or elimination of the NFIP in the Delta; (c) third party actors will suspend development activities in the Delta; and (d) this will have a material positive effect by increasing the Listed Species' population size.  Plaintiffs insist that, if the listed species population does respond positively to FEMA's actions, it is plausible, even probable, that there will be immediate beneficial consequences for the delivery of water under the biological opinions governing the CVP and SWP.  At oral argument Plaintiffs pointed to pages 287-85 of the 2008 Delta Smelt Biological opinion dedicated to describing how the incidental take limit is calculated for delta smelt based in part on the relative population abundance of smelt

32

measured by the Fall Midwater Trawl Index.[4]  The incidental take

limit is considered during the adaptive management processes that

are used to trigger various pumping restrictions.  Accordingly,

if it must be assumed for purposes of a motion to dismiss that

ordering FEMA to engage in the consultation process will increase

delta smelt abundance, it is plausible that this would have a

salutory effect on the magnitude of reductions imposed upon the

CVP and SWP.

For the purposes of pleading, Plaintiffs' allegations

satisfy the causation and redressibility requirements.  Federal

Defendants' motion to dismiss the complaint on standing grounds

is DENIED with respect to Plaintiffs' economic/water supply

delivery theory of injury.

D.   <u>Coalition's Aesthetic/Recreational Theory of Standing.</u>

Alternatively, the Coalition alleges that it has standing to

vindicate its members' purported interests in "boating, fishing,

and wildlife viewing," which supposedly have been harmed by all

of the actions misjoined in the SAC.  SAC ¶¶ 19-20.  Federal

Defendants initially argued that this alternative theory of

standing fails because (1) according to Coalition's by-laws it

"has no members"; and (2) it was not formed to promote anyone's

---

[4] The district court may consider the biological opinion in the context of this motion to dismiss because it is a document of undisputed authenticity referenced within the complaint, *see Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998); *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), and because it is a judicially noticeable public record, *see* Fed. R. Evid. 201.

33

PDF created with pdfFactory trial version www.pdffactory.com

interests in boating, fishing, or wildlife viewing.

1.   **Existence of Members.**

The Coalition maintains that the statement in its by-laws
that it "has no members" is not dispositive of the existence of
membership for purposes of standing.  The California Corporations
Code defines a "member" of a corporation by the right to vote on
significant corporate matters.  Cal. Corp. Code § 5056(a).  A
Nonprofit Mutual Benefit Corporation, such as the Coalition, may
"provide in its articles or bylaws that it shall have no
members."  Cal. Corp. Code § 7310(a).  In the case of a
corporation with no "members," any action requiring a vote shall
only require the approval of the board.  *Id.* § 7310(b)(1).
However, the Coalition has non-voting members, as the Coalition's
Bylaws explain:

> The corporation shall have no Members (as such term is
> defined in Section 5056(a) of the California Nonprofit
> Corporation Law, as codified in the California
> Corporations Code (the "Code")).  Any action which
> would otherwise require approval of Members shall
> require only approval of the Board as set forth in
> Section 7310(b) of the Code.  The corporation's board
> of director's may, in its discretion, admit individuals
> to one or more classes of nonvoting members; the class
> or classes shall have such rights and obligations as
> the board finds appropriate.

Decl. of Scott Hamilton, Doc. 110-2, Exh. 1, p. 1.[5]  The
Coalition has admitted nonvoting members such as Paul Adams and
Dee Dillon.  *Id.* ¶3, Exh. 2

---

[5] Judicial notice may be taken of the Coalition's articles of
incorporation and bylaws.  *E.g., eBay Inc. v Digital Point Solutions, Inc.*,
608 F. Supp. 2d 1156, 1164 n.6 (N.D. Cal. 2009)

34

PDF created with pdfFactory trial version www.pdffactory.com

2.   **Is the Coalition's Purpose Germane to the Asserted Aesthetic Interest of its members?**

FEMA also argues that the Coalition's purpose is not germane to the recreational and aesthetic interests of its members.  To support this argument, FEMA cites to a portion of the Coalition's Articles of Incorporation and 2007 Restated Articles of Incorporation, which state:

> The specific and primary purposes of this Corporation are to better the conditions of those engaged in agricultural pursuits in the San Joaquin Valley by ensuring a sustainable and reliable water supply, thereby improving of the grade of agricultural products and developing a higher degree of efficiency in agricultural operations.

McArdle Decl., Doc. 104-2, Ex. 1 at 4-5,

The Coalition does not dispute the absence of any aesthetic/environmental interest in these articles of incorporation.  Instead, the Coalition cites to their 2009 Restated Articles of Incorporation, which state:

> The specific and primary purposes of this Corporation are to (1) better the conditions of those engaged in agricultural pursuits in the San Joaquin Valley by ensuring a sustainable and reliable water supply, thereby improving of the grade of agricultural products and developing a higher degree of efficiency in agricultural operations, and (2) promote the long-term, ecological health of the Sacramento-San Joaquin Delta and its native species.

Hamilton Decl, Doc. 110-2, at ¶¶ 4-5, Exh. 4, p. 1.  Similar language is contained within the Coalition's 2009 Amended and Restated Bylaws.  *Id.* ¶3, Exh. 3 (Amended and Restated Bylaws) p. 1.  However, the 2009 Amended and Restated Bylaws are dated December 2009, while the Restated Articles of Incorporation are

35

dated January 21, 2010.  <u>Both post-date the filing of the SAC on</u>
<u>July 23, 2009</u>.  Doc. 75.

"As with all questions of subject matter jurisdiction except
mootness, standing is determined as of the date of the filing of
the complaint...  The party invoking the jurisdiction of the
court cannot rely on events that unfolded after the filing of the
complaint to establish its standing." *Wilbur v. Locke*, 423 F.3d
1101, 1107 (9th Cir. 2005)(internal quotations and citations
omitted); *see also Lujan*, 504 U.S. at 570 n. 4 (same).  "Subject
matter jurisdiction must exist as of the time the action is
commenced." *Morongo Band of Mission Indians v. Cal. State Bd. of
Equalization*, 858 F.2d 1376, 1380 (9th Cir. 1988).

   3.   <u>Has the Coalition Properly Alleged Organizational</u>
        <u>standing?</u>

In the alternative, Federal Defendants argue that the
allegations in the SAC are insufficient to satisfy the injury-in-
fact requirement based on aesthetic/ environmental interests.
The relevant standards were set forth in *Coalition for a
Sustainable Delta*, 2008 WL 2899725, at *11-*13.

> In [*NIRS*], the Ninth Circuit started with the principle
> set forth in *Citizens for Better Forestry v. U.S. Dept.
> of Agriculture*, 341 F.3d 961, 971 (9th Cir.2003), that
> provides "environmental plaintiffs must allege that
> they will suffer harm by virtue of their geographic
> proximity to and use of areas that will be affected by
> the [agency's] policy." The [*NIRS*] court then examined
> the record for any evidence of a "geographic nexus"

36

PDF created with pdfFactory trial version www.pdffactory.com

between the plaintiffs and the area where the alleged impact will occur:

> To show a "geographic nexus," petitioners claiming a violation of NEPA must allege that they will suffer harm as a result of their proximity to the area where the alleged environmental impact will occur. We have defined the geographic nexus requirement broadly to permit challenges to actions with wide-reaching geographic effects where the petitioners properly allege, and support with affidavits, that they use the impacted area, even if the impacted area is vast. *See Citizens for Better Forestry*, 341 F.3d at 971 (holding that "Citizens need not assert that any specific injury will occur in any specific national forest that their members visit," where they "properly alleged, and supported with numerous affidavits" their members' use and enjoyment of a "vast range of national forests") ....

> None of declarations submitted by members of *NIRS*, Committee to Bridge the Gap, Public Citizen, or Redwood Alliance explain in any way how their health may be affected by this regulation. They have not alleged with any specificity what geographic areas are most likely to be affected, other than to assert that the regulations impact highways nationwide. Nor have they alleged that they will be exposed to increases in radiation or that they will curtail their use of public highways as a result of the regulation.

*Id*. at 952. Hence, only in the context of searching for any evidence of a "geographic nexus" did the Ninth Circuit ask whether plaintiffs would "curtail" their use of the area in question.

In *Ecological Rights Foundation*, 230 F.3d at 1149-50, the Ninth Circuit reviewed the status of the law regarding injury in fact:

> Under *Laidlaw* ... an individual can establish "injury in fact" by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable-that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction-if the area in question remains or becomes environmentally degraded. Factors of residential contiguity and frequency of use may certainly be relevant to that determination, but are not to be evaluated in a one-size-fits-all, mechanistic manner.

37

1   Daily geographical proximity, for instance, may
    make actual past recreational use less important
2   in substantiating an "injury in fact," because a
    person who lives quite nearby is likely to notice
3   and care about the physical beauty of an area he
    passes often. *See Laidlaw*, 120 S.Ct. at 704 (FOE
4   member alleged injury in fact because "he lived a
    half-mile from Laidlaw's facility; ... he
5   occasionally drove over the North Tyger River, and
    ... it looked and smelled polluted"); *Friends of*
6   *the Earth v. Consolidated Rail Corp.*, 768 F.2d 57,
    61 (2d Cir.1985) (affiant who passed the Hudson
7   River regularly and found its pollution "offensive
    to his aesthetic values" stated injury in fact).
8   On the other hand, a person who uses an area for
    recreational purposes does not have to show that
9   he or she lives particularly nearby to establish
    an injury-in-fact due to possible or feared
10  environmental degradation. Repeated recreational
    use itself, accompanied by a credible allegation
11  of desired future use, can be sufficient, even if
    relatively infrequent, to demonstrate that
12  environmental degradation of the area is injurious
    to that person. *Id.* at 705 (finding that an
13  individual who has canoed in the river and would
    do so again, closer to the discharge point, were
14  it not for the discharges has made a sufficient
    "injury-in-fact" showing). An individual who
15  visits Yosemite National Park once a year to hike
    or rock climb and regards that visit as the
16  highlight of his year is not precluded from
    litigating to protect the environmental quality of
17  Yosemite Valley simply because he cannot visit
    more often.

18
19  This flexible approach is the only one consistent with
    the nature of the aesthetic and recreational interests
20  that typically provide the basis for standing in
    environmental cases. As the Supreme Court has
21  explained, "[a]esthetic and environmental well-being,
    like economic well-being, are important ingredients of
22  the quality of life in our society." *Sierra Club*, 405
    U.S. at 734. Yet, aesthetic perceptions are necessarily
23  personal and subjective, and different individuals who
    use the same area for recreational purposes may
24  participate in widely varying activities, according to
    different schedules. *Laidlaw* confirms that the
25  constitutional law of standing so recognizes, and does
    not prescribe any particular formula for establishing a
26  sufficiently "concrete and particularized," Defenders
    of *Wildlife*, 504 U.S. at 560, aesthetic or recreational
27  injury-in-fact.

28  The SAC alleges that Coalition members visit the Delta and

38

appreciate and use the Delta ecosystem in a variety of ways, including routinely engaging in boating, fishing, and wildlife viewing activities.[6]  SAC ¶19.  The SAC also alleges that Coalition members derive significant enjoyment from these activities, and that such enjoyment is linked to the health of the Delta ecosystem and the Listed Species in particular.  *Id.* The SAC further alleges that FEMA's administration of the Flood Insurance Program adversely impacts the Listed Species and the Delta, SAC. ¶¶ 6, 20, 197-203, 207-208, 210, thereby negatively impacting the Coalition members by impairing their use and enjoyment -- e.g., wildlife viewing -- of the Delta and Listed Species, SAC ¶19.  Essentially, the Coalition maintains that its

_____

[6] To support its assertion that it has at least one member with aesthetic/conservation interest harmed by the challenged actions, the Coalition requests that judicial notice be taken of the Declaration of Coalition member Dee Dillon, which was submitted by the Coalition in connection with Plaintiffs' motion for summary judgment in the related *Coalition for a Sustainable Delta v. Koch*, 1:08-cv-397 lawsuit (the "striped bass" lawsuit). Doc. 111, Exh. 5. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Although it is appropriate to take judicial notice of the existence or content of declarations filed as part of an official court record, *see Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006), Plaintiffs' seek to rely on the Dillon Declaration for the truth of its contents.  This is not a permissible use of a judicially noticed document.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) ("On a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.") (internal quotation marks and citation omitted). Because the Coalition relies on the declaration for the truth of the matters asserted therein, the request is DENIED.

39

PDF created with pdfFactory trial version www.pdffactory.com

members are interested in the conservation of the listed species, which is germane to the organizational purpose of "promoting the long-term, ecological health of the Sacramento-San Joaquin Delta and its native species."

The germaneness test for associational standing is not demanding.  For example, in *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998), plaintiff had organizational standing to assert a claim under the National Environmental Policy Act because the "Club's stated purpose to 'improve and maintain grounds and buildings for athletic purposes' implies the corollary purpose of maintaining an environment, both natural and built, suitable for the game of golf and post-game activities."  Here, the Coalition's stated purpose of promoting the long-term ecological health of the Sacramento-San Joaquin Delta and its native species directly implicates the conservation and aesthetic interests allegedly expressed by its members.  The Coalition's interest in conservation is just as valid as the conservation interests of an environmental organization.  Where, as is often the case, the health of an ecosystem impacts the economic well being of humans, those impacted economically can organize themselves to promote conservation.

Federal Defendants also attack the complaint on the ground that it does not allege the name of any individual member whose

PDF created with pdfFactory trial version www.pdffactory.com

aesthetic interests have been harmed.  But, Federal Defendants point to no authority requiring such specificity in a complaint. Individual members of organizations seeking standing typically file declarations in connection with motions for summary judgment on the issue of standing.  *See N.W. Envt'l Defense Ctr. v. Brown*, 476 F. Supp. 2d 1188 (D. Or. 2007)("Most of the cases cited by defendants ... hash out this issue in a motion for summary judgment when there is an evidentiary record, typically in the form of a declaration from an individual member explaining their particular use of the area and injury suffered by the environmental harm. Because this is a motion to dismiss, there is no such declaration.").

Nevertheless, the Coalition's conservation interests were not included in the Coalition's Articles of Incorporation until after the SAC was filed.  Therefore, this purpose cannot form the basis of the Coalition's standing unless the SAC is amended.

4.   <u>Leave to Amend.</u>

Federal Defendants maintain that it is improper for the district court to grant Plaintiffs leave to amend, citing *Morongo*, 858 F.2d at 1380, which held:  "If jurisdiction is lacking at the outset, the district court has no power to do anything with the case except dismiss."  *Id*.  *Morongo* concerned an Indian tribe's assertion of jurisdiction under various provisions of Title 28.  The Ninth Circuit rejected all of the

41

PDF created with pdfFactory trial version www.pdffactory.com

Tribe's asserted bases for jurisdiction and held that, because

jurisdiction itself was lacking at the time the complaint was

filed, leave to amend should not have been granted.  *Id.* at 1381-

87.  The Ninth Circuit noted:

> When the district court has jurisdiction over the
> action at the outset but the complaint inadequately
> alleges jurisdiction, the court may grant leave to
> amend the defective allegations. See 28 U.S.C. § 1653
> (1982) ("Defective allegations of jurisdiction may be
> amended, upon terms, in the trial or appellate
> courts."). Section 1653 provides a remedy for defective
> allegations only; "it does not provide a remedy for
> defective jurisdiction itself." *Field v.
> Volkswagenwerk AG*, 626 F.2d 293, 306 (3d Cir. 1980)(2-
> 1); *accord Brennan v. University of Kansas*, 451 F.2d
> 1287, 1289 (10th Cir.1971) (section 1653 empowers the
> courts to correct "defects of form, not substance")
> (footnote omitted).

*Id.* at 1382 n.3.  In contrast, where jurisdiction is lacking,

"the district court ... ha[s] no power to grant ... leave to

amend ...."  *Id.*

    Here, with respect to the allegations of

aesthetic/conservation injury, standing was lacking at the time

the complaint was filed.  However, Plaintiffs' assertion of

standing based on economic injury survives this motion to

dismiss.  Therefore, subject matter jurisdiction is not entirely

lacking and leave to amend may be granted.

V. <u>CONCLUSION</u>

    For all the reasons stated above, Federal Defendants' motion

to dismiss for lack of standing:

    (1) DENIED as to Plaintiffs' assertions of economic injury;

42

PDF created with pdfFactory trial version www.pdffactory.com

1   and

2       (2) GRANTED as to the Coalition's assertions of

3   aesthetic/conservation injury because the Coalition did not

4   express aesthetic or conservation interests as one of its

5   organizational purposes prior to the filing of the complaint.

6       Plaintiffs shall have thirty (30) days from electronic

7   service of this memorandum decision to file an amended complaint.

8

9

10  SO ORDERED

11  DATED:  May 10, 2010

12                             /s/ Oliver W. Wanger

13                              Oliver W. Wanger

14                    United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PDF created with pdfFactory trial version www.pdffactory.com