1

2

3

4

5                        UNITED STATES DISTRICT COURT

6                  FOR THE EASTERN DISTRICT OF CALIFORNIA

7   COALITION FOR A SUSTAINABLE DELTA and      1:09-cv-02024 OWW GSA
    KERN COUNTY WATER AGENCY,
8                                              MEMORANDUM DECISION RE
            Plaintiff,                         FEDERAL DEFENDANTS'
9                                              MOTION FOR PARTIAL
        v.                                     SUMMARY JUDGMENT (DOC.
10                                             121)

11  FEDERAL EMERGENCY MANAGEMENT AGENCY
    and WILLIAM CRAIG FUGATE, in his
12  official capacity as Administrator of
    the Federal Emergency Management
13  Agency,

14          Defendants.

15                        I. INTRODUCTION

16

17          This case is before the Court on the Federal Defendant's

18  Motion for Partial Summary Judgment.  This case involves a

19  challenge to the Federal Emergency Management Agency's ("FEMA")

20  administration of the National Flood Insurance Program ("NFIP")

21  in the Sacramento-San Joaquin Delta ("Delta").[1]  Plaintiffs, the

22  Coalition for a Sustainable Delta and Kern County Water Agency,

23

24  [1] This lawsuit was originally filed by Plaintiffs as part of a comprehensive
    challenge to the administration of various government programs that allegedly
25  have adverse effects on species listed under the Endangered Species Act
    ("ESA").  *See* Second Amended Complaint ("SAC"), Doc. 118.  The SAC, filed
26  originally in Case Number 1:09-CV-00490 OWW GSA, brought claims against eight
    separate federal agencies.  Certain claims were consolidated with those in the
27  *Delta Smelt Consolidated Cases*, 1:09-CV-00407 OWW DLB, and three sets of
    claims were severed and assigned new case numbers.  *See* Doc. 100.  Claims 14
28  through 16 against FEMA were assigned the Case Number 1:09-CV-02024 OWW DLB.
    *Id.*

                                    1

allege in their first claim for relief that FEMA's ongoing implementation of the NFIP, by, among other things, certifying community eligibility for the NFIP, monitoring community compliance and enforcement with FEMA's criteria for eligibility, and revising flood maps, provides incentives for development within the Delta that might otherwise not occur and therefore requires consultation under Section 7 of the ESA.  Third Amended Complaint ("TAC"), Doc. 118, at ¶¶ 82-83.[2]

Plaintiffs claim that residential, commercial, and agricultural development in the Delta adversely affects four listed species: Sacramento River winter-run Chinook salmon, the Central Valley spring-run Chinook salmon, the Central Valley Steelhead, and the Delta smelt.  Plaintiffs assert that FEMA's actions under the NFIP cause "more development in the flood-prone areas of the Delta," which harms listed species.  Plaintiffs' challenges to FEMA actions under the NFIP include:  (1) issuance, administration, and enforcement of minimum flood plain management criteria; (2) issuance of Letters of Map Changes ("LOMCs"); and (3) providing flood insurance to property owners within participating communities.  Plaintiffs specifically identify 74 LOMCs and two LOMC "Validations" allegedly issued in violation of

---

[2] Plaintiffs' second claim for relief alleges that FEMA has violated ESA section 7(a)(1) by failing to review its programs to determine how to utilize them to conserve Listed Species and by failing to consult with FWS or NMRF about how to conserve Listed Species.  TAC at ¶¶ 87-90.  The third claim for relief alleges that FEMA has in fact initiated consultation with FWS and NMFS regarding the effect of the NFIP on the Listed Species, but that FEMA is continuing to commit resources through its ongoing administration of the NFIP in violation of ESA Section 7(d).

section 7(a)(2).  McArdle Decl., Doc. 123-1, Ex. 1 at 18-26; Norton Decl., Doc. 124, at ¶ 9 & Ex. C.

Plaintiffs complain that FEMA's floodplain management criteria: "Are designed to reduce threats to lives and to minimize damages to structures and water systems, and are not designed to protect aquatic habitat, threatened or endangered species, or other environmental values."  TAC at ¶ 73.  This includes FEMA-conducted "community visits" and "technical assistance to local officials" to ensure participating communities adopt and enforce land management ordinances, all of which entails FEMA "discretion" in developing and administering the criteria, requiring section 7(a)(2) consultation.

Plaintiffs assert this process encourages third parties to use fill to elevate properties, or build levees to provide flood protection to induce FEMA to remove the property from the SFHA, relieving property owners of the statutory obligation to purchase flood insurance.  TAC at ¶¶ 70-72.  These floodplain mapping activities are said to "encourage" these harmful actions, requiring section 7(a)(2) consultation.  *Id.*

Plaintiffs further complain "FEMA has issued hundreds of new individual flood insurance policies for the new structures within floodplains utilized by and relied upon by the Listed Species without the benefit of consultation in violation of section 7(a)(2).

FEMA and its director Janet Napolitano (collectively,

1   "Federal Defendants" or "FEMA") move for partial summary judgment

2   on the specific grounds that: (1) Plaintiffs' Challenge to FEMA's

3   Minimum Floodplain Management Criteria is barred by the statute

4   of limitations; (2) FEMA's alleged authority to amend the NFIP

5   regulations does not trigger a duty to consult under the ESA; (3)

6   FEMA's procedure of issuing LOMCs does not trigger a duty to

7   consult because that process has no effect on listed species; (4)

8   Plaintiff's challenge to certain LOMCs is precluded because Title

9   42 U.S.C. § 4104 sets forth the exclusive mechanism for

10  challenging LOMCs; and (5) FEMA's issuance of flood insurance is

11  a non-discretionary act that is not subject to Section 7(a)(2)

12  under *National Association of Home Builders v. Defenders of*

13  *Wildlife*, 551 U.S. 644, 669 (2007).  Doc. 122. Plaintiffs oppose.

14

15  Doc. 129.  FEMA replied.  Doc. 138.  The matter came on for

16  hearing in Courtroom 3 on April 7, 2011.

17

18                  II. <u>EVIDENTIARY DISPUTES</u>

19       Plaintiffs have filed several requests for judicial notice

20  in connection with their opposition.  Docs. 131, 142, 144.  All

21  but one is a public record downloaded from a public agency's

22  official website.  These documents are subject to judicial notice

23  under Federal Rule of Evidence 201.  *See Cachil Dehe Band of*

24  *Wintun Indians of the Colusa Indian Comm'ty v. California*, 547

25  F.3d 962, 968-69 n.4 (9th Cir. 2008) (taking judicial notice of

26  gaming compacts located on official California Gambling Control

27  Commission website); *Santa Monica Food Not Bombs v. City of Santa*

28

                              4

1  *Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) (taking judicial

2  notice of "public records" that "can be accessed at Santa

3  Monica's official website").  However, judicially noticed

4  documents may be considered only for limited purposes.  Public

5  records "are subject to judicial notice under [Rule] 201 to prove

6  their existence and content, but not for the truth of the matters

7  asserted therein.  <u>This means that factual information asserted</u>

8  <u>in these document[s] or the meeting cannot be used to create or</u>

9  <u>resolve disputed issues of material fact</u>."  *Coalition for a*

10  *Sustainable Delta v. McCamman*, 725 F. Supp. 2d 1162, 1183-84

11  (E.D. Cal. 2010) (emphasis added).

12

13       FEMA asserts that Plaintiffs are attempting to use the

14  documents for improper purposes.  FEMA also raises relevance

15  objections to some of the documents.[3]

16

17       1.   <u>Documents A, B, L, N, Q & R.</u>

18

19  • <u>Exhibit A</u> - Excerpts from FEMA, Region 10, *Floodplain Habitat*
       *Assessment and Mitigation, Regional Guidance* (Jan. 2010),
20     http://www.fema.gov/pdf/about/regions/regionx/draft_mitigation_
       guide.pdf.

21  • <u>Exhibit B</u> - Excerpts from the Nat'l Marine Fisheries Serv.,

---

[3] Plaintiffs argue that Federal Defendants have waived any objections to their request for judicial notice because Federal Defendants filed their objections to the request on February 11, 2011, even though the briefing schedule for the pending motions set the deadline for any reply briefs on February 7, 2011. Given that the hearing date was not until May 7, 2010 and Plaintiffs have had ample time not only to file a response to the objections but also to file subsequent requests for judicial notice, Plaintiffs have not been prejudiced by the late-filed objections.  The objections will be considered.

Plaintiffs also complain that Defendants' objections to Exhibits A, B, F, I-K, & L should be overruled because each is responsive to Plaintiffs' prior discovery requests.  This argument will not be considered because it amounts to an attempt to avoid the normal procedures for filing a discovery enforcement motion, which include the requirement that the parties meet and confer before bringing any such motion.  *See generally* Local Rule 36-251.

1  Northwest Region, *Endangered Species Act Section 7 Formal*
2  *Consultation and Magnuson-Stevens Fishery Conservation and*
   *Management Act Essential Fish Habitat Consultation for the on-*
   *going National Flood Insurance Program carried out in the*
3  *Puget Sound area in Washington State* (Sept. 22, 2008) ("Puget
   Sound BiOp"), https://pcts.nmfs.noaa.gov/pls/pcts-
4  pub/sxn7.pcts_upload.download?p_file=F3181/200600472.

5  • **Exhibit L** - Excerpts from FEMA Region 10, Floodplain Management
   Guidebook (5th ed. Mar. 2009),
6  http://www.fema.gov/library/viewRecord.do?fromSearch=fromsearch
   &id=3574.
7
   • **Exhibit N** - Excerpts from FEMA Region 10, Community Checklist
8  for the National Flood Insurance Program and the Endangered
   Species Act (July 2010),
9  http://www.fema.gov/pdf/about/regions/regionx/Biological_Opinio
   n_Checklist8_12._10.pdf.
10
   • **Exhibit Q** — FEMA & NMFS, Frequently Asked Questions,
11 Demystifying National Flood Insurance Program Alignment with
   the Endangered Species Act, Edmonds, WA March 1 & 2, 2011.
12
   • **Exhibit R** — FEMA, Overview of Compliance Options, ESA and the
13 NFIP, Implementing a Salmon-Friendly Program — FEMA Region 10
   Regional Workshop.
14
15      FEMA argues that these documents, which pertain to FEMA

16 Region 10's implementation of the NFIP in and around Puget Sound

17 are not relevant to FEMA Region 9's implementation of the NFIP in

18 the Sacramento San Joaquin Delta.  Rule 401 defines "relevant

19 evidence" liberally to include "evidence having __any tendency__ to

20 make the existence of any fact that is of consequence to the

21 determination of the action more or less probable than it would

22 be without the evidence."  (Emphasis added).  Plaintiffs offer

23 these documents to demonstrate that NMFS has determined that

24 implementation of the NFIP in the Puget Sound region jeopardizes

25 the continued existence of listed salmonid species in that

26 region.  This satisfies the relevance standard, as any

27 differences in indigenous conditions in Puget Sound go to weight
28

6

1    not the admissibility of the information.  FEMA's relevance

2    objections are OVERRULED.

3        Plaintiffs offer these documents for the truth of the

4    matters asserted therein, to prove that a dispute exists over

5    whether FEMA's administration of the NFIP may affect listed

6    species.  This is an impermissible use of judicially noticed

7
     documents and the objections on this ground are SUSTAINED.

8
         Documents A, L, N, Q, & R, all of which were authored by

9    FEMA, are admissible under Federal Rule of Evidence 801(d)(2)(D),

10   which permits the admission of statements offered against a party

11
     that are the statement of the party or the party's agent or

12
     servant, "concerning a matter within the scope of the agency or

13
     employment, made during the existence of the relationship."  *See*

14
     *United States v. Bonds*, 608 F. 3d 495, 503 (9th Cir. 2010).  Each

15
     of these documents is an official FEMA publication concerning

16
     matters within FEMA's scope of operations.

17
         Exhibit B, a biological opinion prepared by NMFS, is

18
     admissible under Federal Rule of Evidence 803(8), which provides

19
     an exception to the hearsay rule:

20
21
                (8) Public records and reports. Records, reports,
22              statements, or data compilations, in any form, of
                public offices or agencies, setting forth (A) the
23              activities of the office or agency, or (B) matters
                observed pursuant to duty imposed by law as to which
24              matters there was a duty to report .....

25
     NMFS prepares biological opinions under a duty imposed by ESA §
26
     7(a)(2).
27

28

                                    7

1

2      Federal Defendants' objections to the admission of Documents

3   A, B, L, N, Q & R for their truth are OVERRULED.[4]

4         2.   Document F.

5   • **Exhibit F** - Excerpts from FEMA, *FEMA-1628-DR, California
       Federal Disaster Assistance Biological Assessment* (May 2006),
6      http://www.fema.gov/library/viewRecord.do?id=1966.

7      This document contains excerpts of a draft biological

8   assessment for ESA consultation with NMFS over the potential

9   effects of "typical projects that are funded by FEMA in response

10  to, or in preparation for, disasters" in California.  FEMA argues

11  that this document is not relevant because its actions responding

12  to and/or preparing for disasters are not challenged in the

13  Complaint.  This relevancy objection is OVERRULED, because the

14  document, which concludes that activities like removal of

15  vegetation, grading, fill, bank stabilization, and others taken

16  under the NFIP "may affect" listed species, and has some tendency

17  to show these activities make it more likely that implementation

18  of the NFIP may affect listed salmonids in the Delta.

19      This document is a party admission and separately admissible

20  on that ground under Federal Rule of Evidence 801(d)(2).

21  Alternatively, this document is also admissible as a public

22

23

24  _____

25  [4] Plaintiffs submitted an additional, fourth, request for judicial notice on
    May 20, 2011, more than a month after oral argument, seeking judicial notice
26  of three additional documents pertaining to FEMA's implementation of the NFIP
    in Region 10, arguing they demonstrate FEMA has discretion in its
27  administration of the NFIP to alter implementation to benefit listed
    salmonids.  Doc. 151.  These documents are unnecessary to the resolution of
28  the pending motion, as other documents demonstrate the existence of such
    discretion.

1  record under Rule 803(8), as the ESA mandates the preparation of

2  biological assessments when certain conditions exist.

3       FEMA's objections to the admission of Exhibit F for its

4  truth are OVERRULED.

5

6       3. <u>Documents C, C1, D, E, E1, E2, & P.</u>

7  • **Exhibit C - Settlement Agreement and [Proposed] Order in**
   ***Audubon Soc'y of Portland v. FEMA*, No. 3:09-cv-00729-HA (D.**
8  **Or. filed June 25, 2009), ECF No. 20 (filed July 9, 2010),**
   **obtained by accessing the official PACER web page for the U.S.**
9  **District Court for the District of Oregon at**
   **https://ecf.ord.uscourts.gov/cgi-bin/login.pl.**
10
   • **Exhibit C1 - Order in *Audubon Soc'y of Portland v. FEMA,* No.**
11 **3:09-cv-00729-HA (D. Or. filed June 25, 2009), ECF No. 21**
   **(filed July 12, 2010), obtained by accessing the official PACER**
12 **web page for the U.S. District Court for the District of Oregon**
   **at https://ecf.ord.uscourts.gov/cgi-bin/login.pl.**
13
   • **Exhibit D - Settlement Agreement and Stipulation of Dismissal**
14 **in *Nat'l Wildlife Fed'n v. Fugate*, No. 1:10-cv-22300-KKM (S.D.**
   **Fla. filed July 13, 2010), ECF No. 20 (filed Jan. 20, 2011),**
15 **obtained by accessing the official CM/ECF web page for the U.S.**
   **District Court for the Southern District of Florida at**
16 **https://ecf.flsd.uscourts.gov/cgi-bin/login.pl.**

17 • **Exhibit E - Sixth Joint Motion for Stay in *WildEarth Guardians***
   ***v. FEMA*, No. 09-0882- RB/WDS (D.N.M. filed Sept. 14, 2009),**
18 **ECF No. 34 (filed Jan. 28, 2011), obtained by accessing the**
   **official PACER web page for the U.S. District Court for the**
19 **District of New Mexico at https://ecf.nmd.uscourts.gov/cgi-**
   **bin/login.pl.**
20
   • **Exhibit E1 - First Amended Complaint in *WildEarth Guardians v.***
21 ***FEMA*, No. 09-0882-RB/WDS (D.N.M. filed Sept. 14, 2009), ECF**
   **No. 1 (filed Sept. 14, 2009), obtained by accessing the**
22 **official PACER web page for the U.S. District Court for the**
   **District of New Mexico at https://ecf.nmd.uscourts.gov/cgi-**
23 **bin/login.pl.**

24 • **Exhibit E2 – Settlement Agreement and Stipulation of Dismissal**
   **in *Forest Guardians v. FEMA*, No. 1:01-cv-00079-MCA-RLP (D.N.M.**
25 **filed Jan. 22, 2001), ECF No. 12 (filed Feb. 25, 2002),**
   **obtained by accessing the official PACER web page for the U.S.**
26 **District Court for the District of New Mexico at**
   **https://ecf.nmd.uscourts.gov/cgi-bin/login.pl.**
27
   • **Exhibit P - Settlement Agreement and Order of Dismissal in**
28 ***WildEarth Guardians v. FEMA*, No. 09-0882-RB/WDS (D.N.M. filed**

Sept. 14, 2009), ECF No. 37 (filed Feb. 11, 2011, entered Feb. 15, 2011)

These documents are court filings and settlements of other litigation.  FEMA objects that under Federal Rule of Evidence 408, these exhibits are inadmissible as evidence of liability.  *See also Green v. Baca*, 226 F.R.D. 624, 640 (C.D. Cal. 2005) (noting that Rule 408 bars the use of evidence of settlement negotiations or completed settlements in other cases to prove liability).  Rule 408 "does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution...."  Fed. R. Evid. 408(b).  Plaintiffs claim these documents are offered simply to demonstrate "that FEMA has either voluntarily settled claims that it has failed to consult with respect to [in] its ongoing implementation of the [NFIP]."  Doc. 131.  This is to show consciousness of liability.  Plaintiffs actually use these documents in their Opposition to the Motion for Partial Summary Judgment to argue "it would be curious for FEMA to voluntarily consult if, as the agency claims, it has no legal basis to do so."  Doc. 129 at 9.  These are impermissible uses of the settlements to establish liability.  For this purpose, the objection is SUSTAINED.

Plaintiffs alternatively contend that the settlements demonstrate FEMA has discretion to take actions that benefit the

species, because if they had no such discretion it could not

enter into the settlements as a matter of law.  Doc. 141 at 4.

FEMA rejoins that, for example, Exhibit P, a settlement agreement

pertaining to FEMA's administration of the NFIP in New Mexico,

does not state or imply that FEMA retains discretionary authority

with respect to any of the three components of FEMA's

administration of the NFIP in the Delta.  But, that settlement

calls for initiation of consultation over, among other things,

FEMA's floodplain mapping activities within New Mexico.  That

FEMA could lawfully enter into consultation on that activity

(which would violate *Home Builders* if FEMA did not have

discretion to modify its mapping activities for the benefit of

listed species) is relevant to whether FEMA retains similar

discretion in its mapping activities in the Delta.  These

settlement documents are admissible for the limited purpose of

demonstrating that FEMA does retain discretion to take actions to

benefit the species under the NFIP, not for the truth or to

demonstrate liability.  FEMA's objections as to Exhibits C, C1,

D, E, E1, E2, and P are OVERRULED solely on that ground.

    4. Exhibit G.

- **Exhibit G - Excerpts from California Resources Agency,**
  ***Governor's Delta Vision Blue Ribbon Task Force, Delta Vision***
  ***Strategic Plan*** **(Oct. 2008),**
  **http://deltavision.ca.gov/StrategicPlanningProcess/StaffDraft/D**
  **elta_Vision_Strategic_Plan_standard_resolution.pdf.**

    Exhibit G consists of excerpts of the Delta Vision Strategic

Plan, prepared by Governor Arnold Schwarzenegger's Delta Vision

Blue Ribbon Task Force.  Its discussion of the impacts of development on Delta species is arguably relevant, but it is subject to judicial notice solely for the limited purposes discussed above.

Federal Rule of Evidence 803(8) exempts from the hearsay rule public reports concerning "matters observed pursuant to duty imposed by law as to which matters there was a duty to report." The Delta Vision Strategic Plan was the result of California Executive Order S-17-06, requiring a Blue Ribbon Task Force to develop a strategic plan for the Delta.

FEMA's objections to Exhibit G are OVERRULED.  The document is admissible as a public record, but its contents and the opinions expressed are subject to dispute.

    5. Exhibit H.

- Exhibit H - Excerpts from Public Policy Institute of California, *Envisioning Futures for the Sacramento-San Joaquin Delta* (2007), http://www.ppic.org/content/pubs/report/R_207JLR.pdf.

Exhibit H contains excerpts of a document prepared by the Public Policy Institute of California ("PPIC").  Assuming, *arguendo*, this document is relevant, it is not subject to judicial notice, as PPIC is a non-governmental organization. Even if it were judicially noticeable, it is not admissible for the truth of its contents.  Nor is it admissible under either Rule 801(d)(2) because it is not a FEMA publication or Rule 803(8) because it was not prepared by a government agency

pursuant to a legal duty.

     At oral argument, counsel for Plaintiffs argued that this and all other documents for which judicial notice is sought would be admissible at trial through their retained expert witness. However, any documents offered on summary judgment must be authenticated by an appropriate affidavit or declaration providing a foundation for their admissibility.  *See Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002) ("[U]nauthenticated documents cannot be considered in a motion for summary judgment.").  Plaintiffs must submit an appropriate affidavit demonstrating the admissibility of these documents through their expert.  *See In Re Homestore.com Inc. Securities Litig.*, 347 F. Supp. 2d 769, 780 (C.D. Cal. 2004) (plaintiff's assertion that a document is an expert report and presentation of purported expert's background and the source of the data insufficient to authenticate or provide the required foundation for the document).  Federal Defendants must be afforded the opportunity to challenge the expert's qualifications and the admissibility of any opinion testimony based on the documents in question.

     Alternatively, Plaintiffs invoke Federal Rule of Civil Procedure 56(d), which permits a court to defer considering a motion, deny it, allow time to obtain additional affidavits or discovery, or issue any other appropriate order if the non-moving party demonstrates by affidavit or declaration that it cannot present facts essential to justify its opposition.  Plaintiffs'

13

1    offer of proof during oral argument that they have retained an

2    expert who will provide foundations for Exhibit H does not

3    explain why they did not earlier address the issue.  There is no

4    need to defer a decision on issues for which Exhibit H "may

5    create" a material dispute of fact.  The merits of the pending

6    motion can be resolved without reference to this document.  It is

7    unnecessary to resolve Plaintiffs' request for a rule 56(d)

8    continuance to secure expert evidence that would render Exhibit H

9    admissible.

10

11            6.   Exhibits I through K.

12   • **Exhibit I** - Excerpts from Am. Insts. for Research, *The*
13   *Evaluation of the National Flood Insurance Program — Final*
     *Report* (Oct. 2006) ("NFIP Evaluation Final Report"),
14   http://www.fema.gov/library/viewRecord.do?id=2573.

15   • **Exhibit J** - Excerpts from Am. Insts. for Research, *The*
16   *Development and Envtl. Impact of the Nat'l Flood Ins. Program:*
     *A Summary Research Report* (Oct. 2006) ("The Developmental and
17   Envtl. Impact of the NFIP"),
     http://www.fema.gov/library/viewRecord.do?id=2597.

18   • **Exhibit K** - Excerpts from Am. Insts. for Research, Assessing
19   the Adequacy of the Nat'l Flood Ins. Program's 1 Percent Flood
     Standard (Oct. 2006),
20   http://www.fema.gov/library/viewRecord.do?id=2595.

21   Exhibits I through K consist of excerpts of documents prepared by

22   the American Institutes for Research, a private entity.  Although

23   the documents were prepared with funds provided by FEMA, the

24   documents explicitly provide that their content "does not

25   necessarily reflect the views or policies of [FEMA]."  Norton

26   Decl., Ex. I at 120, Ex. J at 133, Ex. K at 148.  These documents

27   are not admissions by FEMA.

28

1    The documents are arguably subject to judicial notice, as

2    they are made available for public inspection on the FEMA

3    website.  *See Victoria v. JPMorgan Chase Bank*, 2009 WL 5218040 *2

4    (E.D.C.A. Dec. 29, 2009).  The statements contained in the

5    documents are not subject to judicial notice for their truth, nor

6

7    are they admissions of a party opponent or government reports.

8        As with Exhibit H, these documents have not been properly

9    authenticated for admission through an expert witness for the

10   truth.  Plaintiffs again offer to provide such authentication at

11   a later stage of discovery.  Again, as with Exhibit H, because

12   Exhibits I through K are unnecessary to the merits ruling on the

13   pending motions, it is unnecessary to resolve Plaintiffs' request

14   for a Rule 56(d) continuance to secure expert evidence that would

15   render Exhibits I through K admissible.

16

17        7.   Exhibits M & N.

18   • Exhibit M - Excerpts from Office of Flood Ins., Fed. Ins.
       Admin., U.S. Dept. of Housing and Urban Dev., Revised
19     Floodplain Management Regulations of the National Flood
       Insurance Program, Final Environmental Impact Statement (Sept.
20     1976), http://www.fema.gov/library/viewRecord.do?id=3271.

21   FEMA does not object to judicial notice of Exhibit M, which is a

22   public record.  Plaintiffs' request for judicial notice of

23   Exhibit M is GRANTED.  It will be considered for the truth under

24   both Federal Rule of Evidence 801(d)(2)(D) and 803(8).

25

26        8.   Exhibit O and O1.

27        The Declaration of Robert C. Horton in support of

28

                                 15

1   Plaintiffs' request for judicial notice lists two additional

2   documents, Exhibits O and O1, that were not addressed in any of

3   Plaintiffs' requests for judicial notice.  *See* Doc. 131

4   (requesting judicial notice of Exhibits A-N; Doc. 142 (same as to

5   Exhibit P); Doc. 144 (same as to Exhibits Q-R).  Exhibits O and

6   O1 are referenced by Plaintiffs in support of their alternative

7   request to deny Federal Defendants' motion for partial summary

8   judgment pursuant to Federal Rule of Civil Procedure 56(d).

9   Specifically, Exhibit O is a copy of FEMA's October 19, 2010

10  letter responding to Plaintiffs' request for documents under the

11  Freedom of Information Act ("FOIA").  Exhibit O1 is a copy of a

12  complaint filed by Plaintiffs on September 8, 2010 against FEMA

13  alleging FOIA violations.  Both of these documents are judicially

14  noticeable court records, admissible to demonstrate their

15  existence and content, not the truth of or any disputed parts of

16  their contents.

17

18  ### III. BACKGROUND

19  **A.   The Endangered Species Act.**

20      The ESA provides for the listing of species as threatened or

21  endangered.  16 U.S.C. § 1533.  The Secretaries of Commerce and

22  Interior share responsibility for implementing the ESA.  The

23  Secretary of Commerce has responsibility for listed marine

24  species (including anadromous salmonids) and administers the ESA

25  through the National Marine Fisheries Service ("NMFS").  The

26

27

28

                                16

Secretary of Interior is responsible for listed terrestrial and inland fish species (including the delta smelt) and administers the ESA through the United States Fish and Wildlife Service ("FWS").  *See id*. § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b).

ESA Section 9 prohibits "any person subject to the jurisdiction of the United States" from "tak[ing] any such species within the United States."  16 U.S.C. § 1538(1)(B).  "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id*. § 1532(19).  The ESA's citizen suit provision allows a private plaintiff to bring an action to enjoin private activities alleged to be in violation of the ESA.  *Id*. § 1540(g).

Section 7(a)(2) directs each federal agency to insure, in consultation with FWS or NMFS (the "consulting agency"), that "any action authorized, funded, or carried out by such agency... is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify designated critical habitat.  *Id*. § 1536(a)(2).  The term "action" is defined as:

> all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:
>
> (a) actions intended to conserve listed species or their habitat;
>
> (b) the promulgation of regulations;
>
> (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-

17

aid; or

(d) actions directly or indirectly causing
modifications to the land, water, or air.

50 C.F.R. § 402.02.

If the agency proposing the action ("action agency")
determines that the action "may affect" listed species or
critical habitat, it must pursue either informal or formal
consultation.  50 C.F.R. §§ 402.13-402.14.  Formal consultation
is required unless the action agency determines, with the
consulting agency's written concurrence, that the proposed action
is "not likely to adversely affect" a listed species or its
critical habitat.  *Id*. §§ 402.14(b)(1), 402.13(a).  If formal
consultation is required, the consulting agency must prepare a
biological opinion stating whether the proposed action is likely
to jeopardize the continued existence of any listed species or
destroy or adversely modify critical habitat.  16 U.S.C. §
1536(a)(2); 50 C.F.R. § 402.14.

The ESA's implementing regulations provide that "Section 7
and the requirements of this part apply to all actions in which
there is discretionary Federal involvement or control."  50
C.F.R. § 402.03.  Section 7 does not apply where an agency
"simply lacks the power to 'insure' that [its] action will not
jeopardize endangered species."  *See Home Builders*, 551 U.S. at
667.

18

1

B.    The National Flood Insurance Act and Program.

2

A 2004 decision in a section 7 challenge to FEMA's

3

implementation of the NFIP in Puget Sound summarizes the NFIP:

4

The three basic components of the NFIP are: (1) the
identification and mapping of flood-prone communities, (2)
the requirement that communities adopt and enforce
floodplain management regulations that meet certain minimum
eligibility criteria in order to qualify for flood
insurance, and (3) the provision of flood insurance. As part
of the NFIP, FEMA also implements a Community Rating System
("CRS"), which provides discounts on flood insurance
premiums in those communities that establish floodplain
management programs that go beyond NFIP's minimum
eligibility criteria.

5

6

7

8

9

10

*Nat'l Wildlife Fed'n v. FEMA*, 345 F. Supp. 2d 1151, 1155 (W.D.

11

Wash. 2004) ("*NWF v. FEMA*").

12

13

1.    FEMA's Floodplain Management Criteria.

14

Congress created the NFIP to, among other things, "provid[e]

15

appropriate protection against the perils of flood losses" and to

16

"minimiz[e] exposure of property to flood losses."  42 U.S.C. §

17

4001(c).  The program seeks to "encourage State and local

18

governments to make appropriate land adjustments to constrict the

19

development of land which is exposed to flood damage and minimize

20

damage caused by flood losses."  *Id*. § 4001(e).  To accomplish

21

these objectives, Congress mandated that FEMA "shall make flood

22

insurance available" in communities that have (1) evidenced

23

interest in securing flood insurance through the NFIP and (2)

24

adopted adequate floodplain management regulations consistent

25

26

with criteria developed by FEMA.  *See* 42 U.S.C. § 4012(c); *see*

27

*id*. § 4022(a); 44 C.F.R. § 60.1(a).  The criteria must be

28

19

designed to encourage state and local governments to adopt flood

plain regulations that will:

> (1) constrict the development of land which is exposed
> to flood damage where appropriate,

> (2) guide the development of proposed construction away
> from locations which are threatened by flood hazards,

> (3) assist in reducing damage caused by floods, and

> (4) otherwise improve the long-range land management
> and use of flood-prone areas.

42 U.S.C. § 4102(c).

In 1976, after notice and opportunity for public comment,

FEMA promulgated regulations setting forth the minimum floodplain

management criteria required by the NFIA.  *See* 41 Fed. Reg.

46,975 (Oct. 26, 1976); 44 C.F.R. §§ 60.3 (criteria for flood-

prone areas), 60.4 (criteria for mudslide-prone areas), 60.5

(criteria for flood-related erosion-prone areas).  The

regulations have not been amended in any substantive fashion

since 1997.  *See* 62 Fed. Reg. 55,706, 55,716 (Oct. 27, 1997).  In

order to qualify for flood insurance under the NFIP, a community

must adopt and enforce a floodplain management ordinance that

meets or exceeds the regulatory criteria.  *See* 44 C.F.R. §§

59.2(b), 59.22(a)(3), 60.1.

The land management criteria for flood-prone areas require

participating communities to adopt land use ordinances that

restrict development of land susceptible to flooding.  *See* 44

C.F.R. §§ 60.3, 60.1(d).  In relevant part, the ordinances must

require new or substantially improved structures to be built with

20

the lowest floor at or above the "base flood elevation."  *Id.* §
60.3(c)(2)-(3).  The base flood is the flood that has a one
percent chance of being equaled or exceeded in any given year
(referred to as the "100-year flood").  *Id.* § 59.1.  The
ordinances also must include effective enforcement provisions.
*Id.* § 59.2(b).  A community that fails to adequately enforce its
floodplain management ordinance may be put on probation or
suspended from the NFIP.  *See* 44 C.F.R. § 59.24(b)-(c)

   2.   <u>FEMA's Floodplain Mapping Activities.</u>

        Under the NFIA, Congress directed FEMA to identify and
publish information for floodplain areas nationwide that have
special flood hazards (referred to as "Special Flood Hazard
Areas" or "SFHAs") and to establish flood-risk zone data.  42
U.S.C. § 4101.  This data is then transferred onto Flood
Insurance Rate Maps ("FIRMs").  44 C.F.R. § 59.1.  The SFHA is
the "land within a community subject to a 1 percent or greater
chance of flooding in any given year," also referred to as the
base flood.  *Id.*

        The NFIA requires FEMA to assess the need to revise and
update FIRMs and flood-risk zones "based on an analysis of all
natural hazards affecting flood risks."  42 U.S.C. § 4101(e)-(f).
State or local governments may request FIRM revisions, provided
they submit sufficient technical data to justify the request.
*See* 42 U.S.C. § 4101(f)(2).  Individual landowners may also

request that a FIRM be revised by requesting a LOMC.  *See* 44 C.F.R. §§ 65.4-65.8; 44 C.F.R. pt. 72; 42 U.S.C. § 4104; Norton Decl., Doc. 124, at ¶ 6.

        3.    Letters of Map Change

     FEMA periodically revises FIRMs by either publishing a new FIRM or by making minor changes or corrections through Letters of Map Revisions ("LOMRs") or Letters of Map Amendments ("LOMAs"), collectively LOMCs.  44 C.F.R. pts. 70, 72; Norton Decl., Doc. 124, at ¶ 6.  A LOMR is a modification of the effective FIRM "based on the implementation of physical measures that affect the hydrologic or hydraulic characteristics of a flooding source and thus result in a modification of the existing regulatory floodway[], the effective [BFEs] or the SFHA."  44 C.F.R. § 72.2. A LOMR may also be issued as a result of updated flood hazard data that requires a modification of the FIRM.  *See* 44 C.F.R. §§ 65.4-65.6; Norton Decl., Doc. 124, ¶ 6.b.  Any LOMR affecting flood elevation levels is subject to the administrative and judicial review procedures set forth in Section 4104 of the NFIA. *See* 44 C.F.R. pt. 67; *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 989 (8th Cir. 2010).

     FEMA may issue a LOMR based on fill activities ("LOMR-F"), which is a "modification of the SFHA shown on the FIRM based on the placement of fill outside the existing regulatory floodway." 44 C.F.R. § 72.2.  If issued, a LOMR-F revises the SFHA boundary

1   by letter to exclude the elevated property from the coverage

2   under the SFHA.  Norton Decl., Doc. 124, at ¶ 6.c.

3        By the time any LOMR, including an LOMR-F, is requested, the

4   project (in the case of an LOMR-F, the placement of fill) will

5   have already been completed.  An <u>individual</u> LOMR <u>itself</u> does not

6   authorize, permit, fund, license, zone or otherwise approve

7   construction of any projects in the floodplain.  Norton Decl., ¶¶

8   6.b, 6.c & Ex. B at 2, 6.

9        A Letter of Map Amendment ("LOMA") is an official

10  determination by FEMA that a property has been inadvertently

11  included in the SFHA or regulatory floodway, and the LOMA amends

12  the FIRM to correct the error.  44 C.F.R. § 70.5; Norton Decl., ¶

13  6.a.  A property owner who believes his property has been

14  inadvertently included in the floodplain may request a LOMA to

15  establish the property's actual location in relation to the SFHA.

16  *Id.*[5]

17

18       4.   <u>Conditional Letters of Map Change.</u>

19       In advance of completing a project (e.g., a fill activity),

_____

[5] The parties also mention the term "LOMC Validation."  When FEMA issues a new
FIRM, it automatically supersedes previously issued LOMCs for the covered
area.  Frequently, however, the results of prior LOMCs cannot be shown on the
revised FIRM due to map scale limitations.  In recognition that some LOMCs may
still be valid even though the flood hazard information on the FIRM has been
revised, FEMA has established an automatic process for revalidating LOMCs.
Specifically, FEMA will issue a LOMC Validation letter to the relevant
community that identifies:  (1) the LOMCs that will be depicted in the revised
FIRM; (2) the LOMCs that are no longer valid based on new detailed flood
hazard data; and (3) those LOMCs whose results could not be mapped and shown
on the revised FIRM panel(s) because of map scale limitations or because the
affected areas were determined to be outside the SFHA shown on the effective
FIRM.  Norton Decl., ¶ 7 & Ex. A at 8-9.

a community or individual may request FEMA's comments as to whether a proposed project, if built as proposed, would result in a FIRM revision.  FEMA's comments in response to such a request are issued in the form of a Conditional Letter of Map Amendment ("CLOMA"), Conditional Letter of Map Revision ("CLOMR"), or Conditional Letter of Map Revision based on Fill ("CLOMR-F").  44 C.F.R. § 65.8, pt. 70, pt. 72; Norton Decl., ¶ 8 & Ex. B.  A CLOMA is FEMA's comment on whether a proposed structure would, upon construction, be located on existing natural ground above the BFE.  44 C.F.R. § 72.2.  CLOMA requests do not involve any projects that physically modify the floodplain.  *Id*.  A CLOMR is FEMA's comment on whether a project would be compliant with applicable NFIP regulations and would, upon construction, result in modification of the BFE, the SFHA, or other flood hazard data depicted on a FIRM.  *Id*.  A CLOMR-F is FEMA's comment on whether a project would, upon construction, be elevated above the BFE and therefore out of the SFHA through the placement of engineered fill.  *Id*.

FEMA mandates that a party requesting a CLOMR or CLOMR-F provide information demonstrating that the proposed project complies with the ESA:

> The CLOMR-F or CLOMR request will be processed by FEMA only after FEMA receives documentation from the requester that demonstrates compliance with the ESA. The request must demonstrate ESA compliance by submitting to FEMA either an Incidental Take Permit, Incidental Take Statement, "not likely to adversely affect" determination from [NMFS and FWS] or an official letter from [NMFS and FWS] concurring that the

1
2
3

> project has "No Effect" on listed species or critical habitat.  If the project is likely to cause jeopardy to listed species or adverse modification of critical habitat, then FEMA shall deny the conditional LOMC request.

4

*See* Norton Decl., Ex. B at 3.  If the project requires a federal

5

permit or other form of federal authorization, "the applicant may

6

coordinate with that agency to demonstrate to FEMA that Section 7

7

ESA compliance has been achieved through that other Federal

8

agency."  *Id*. at 6.  If no federal agency is involved and a

9

listed species may be harmed by the project, the applicant "would

10

be required to obtain [ESA] compliance through the Section 10

11

process.  This process includes applying for an Incidental Take

12

Permit ('ITP') [from NMFS or FWS] and preparing a habitat

13

conservation plan."  *Id*. at 5.

14

15

           5.   The Issuance Of Flood Insurance Within Participating
16                Communities.

17

     Congress found that "many factors have made it uneconomic

18

for the private insurance industry alone to make flood insurance

19

available to those in need of such protection on reasonable terms

20

and conditions" and, therefore, authorized the creation of the

21

NFIP "with large-scale participation of the Federal Government

22

and carried out to the maximum extent practicable by the private

23

insurance industry."  42 U.S.C. § 4001(b).  Congress mandated

24

that FEMA carry out a "program which will enable interested

25

persons to purchase insurance against loss resulting from

26

27

physical damage to or loss of real property or personal property

28

25

related thereto arising from any flood occurring in the United

States." *Id*. § 4011(a).

FEMA's role in selling or underwriting flood insurance is

defined as follows:

> The Director shall make flood insurance available in
> only those States or areas (or subdivisions thereof)
> which he has determined have -
>
> > (1) evidenced a positive interest in securing
> > flood insurance coverage under the flood insurance
> > program, and
> >
> > (2) given satisfactory assurance that by December
> > 31, 1971, adequate land use and control measures
> > will have been adopted for the State or area (or
> > subdivision) which are consistent with the
> > comprehensive criteria for land management and use
> > developed under section 4102 of this title . . .

42 U.S.C. § 4012(c).

Federal flood insurance is marketed to the public in one of

two ways:  directly by FEMA, or through the Write Your Own

("WYO") program, which authorizes FEMA to "enter into

arrangements with individual private sector property insurance

companies [WYO companies]" whereby such companies "may offer

flood insurance coverage under the program to eligible

applicants."  44 C.F.R. § 62.23(a); 42 U.S.C. § 4081(a).  The

purpose of the WYO program is "to provide coverage to the maximum

number of structures at risk and because the insurance industry

has marketing access through its existing facilities not directly

available to the FIA, it has been concluded that coverage will be

extended to those who would not otherwise be insured under the

Program."  44 C.F.R. pt. 62, App. A Art. I.

1

C.    The Impact of Development on the Delta.

2

        For purposes of their motion for partial summary judgment,

3

Federal Defendants do not challenge Plaintiffs' allegations

4

regarding the impact of development activities on the Delta and

5

the listed species.   These are undisputed facts.

6

7

        The Sacramento-San Joaquin Delta is the largest estuary on

8

the West Coast.   TAC ¶ 1.   The Delta is crucial to California's

9

economy and provides critical ecosystem services to the State.

10

TAC ¶ 1.   The Delta also supports more than 750 plant and animal

11

species, including 130 fish species, and provides critical

12

habitat for a number of ESA listed species including the

13

Sacramento River winter-run Chinook salmon, the Central Valley

14

spring-run Chinook salmon, the Central Valley steelhead,

15

(collectively, the "Listed Salmonids"), and the delta smelt,

16

(collectively, the "Listed Species").   TAC ¶ 2.

17

18

        Plaintiffs allege that Development in the Delta has

19

eliminated much of the historical habitat of native Delta fishes

20

and harmed the remaining habitat.   TAC ¶¶ 79-80.   According to

21

the United States Geological Survey, more than 95 percent of the

22

historic tidal marshes in the Delta have been leveed and

23

experienced attendant losses in fish and wildlife habitat.   TAC ¶

24

8.   Development in the Delta has resulted in the clearing of

25

riparian habitat along the Sacramento River, which reduces the

26

volume of large wood debris needed to form and maintain the

27

stream habitat that salmon depend on in their various life

28

27

stages.  TAC ¶ 81.  In addition, development leads to increased sedimentation, which can adversely affect salmonids during all freshwater life stages.  *Id*.  Other land use activities associated with development, such as road construction, have significantly altered the fish habitat quantity and quality by altering the streambank and channel morphology, altering water temperatures, and eliminating spawning and rearing habitat.  *Id*. Increased development in the Delta also increases wastewater and urban runoff from lawns, sidewalks, and roads.  TAC ¶ 80.  Such runoff contains pesticides and other contaminants harmful to the Listed Species.  *Id*.

According to NMFS, development in floodplains and adjacent riparian habitat is among the activities that can pose a high risk of take of salmonids:

> Shoreline and riparian disturbances (whether in the riverine, estuarine, marine, or floodplain environment) may retard or prevent the development of certain habitat characteristics upon which the fish depend (e.g., removing riparian trees reduces vital shade and cover, floodplain gravel mining, development, and armoring shorelines reduces the input of critical spawning substrates, and bulkhead construction can eliminate shallow water rearing areas).

65 Fed. Reg. 42,422, 42,473 (July 10, 2000); *see also* 58 Fed. Reg. at 33,214 ("In the Sacramento River, critical habitat [for winter-run Chinook salmon] includes the river water, river bottom, and the adjacent riparian zone....  [R]iparian streambanks ... support[] vegetation that either overhangs or protrudes into the water and, consequently, provides shade and

28

1  escape cover for salmonids and other wildlife... [and] also

2  increases river productivity which, in turn, provides prey for

3  salmonids.").  NMFS has also determined that "concentrations of

4  pesticides may affect salmonid behavior and reproductive

5  success."  65 Fed. Reg. at 42,473.

6

7       Plaintiffs allege that under FEMA's mapping regulations,

8  communities and private landowners may place fill or construct

9  levees to remove land from the regulatory floodplain, thereby

10  enabling them to avoid the requirement to obtain flood insurance.

11  *See* TAC at ¶¶ 70-71.

12

13  D.  <u>No Formal Consultation.</u>

14       FEMA does not contend that it has formally consulted with

15  NMFS over the NFIP's impacts on the Listed Species in the Delta.

16

17  IV. <u>STANDARD OF DECISION</u>

18       "A party against whom relief is sought may move, with or

19  without supporting affidavits, for summary judgment on all or

20  part of the claim."  Fed. R. Civ. P. 56(b).  "The standard

21  applied to a motion for partial summary judgment is identical to

22  the standard applied to adjudicate a case fully by summary

23  judgment*." Urantia Found. v. Maaherra*, 895 F. Supp. 1335, 1335

24  (D. Ariz. 1995).  "A court may grant summary adjudication -- also

25  known as partial summary judgment -- if there is no genuine

26  dispute of material fact as to a portion of a claim or issue and

27  the moving party is entitled to judgment as a matter of law."

28

*Prado v. Allied Domecq Spirits and Wine Group Disability Income Policy*, 2010 WL 3119934, at *2 (N.D. Cal. Aug. 2, 2010) (citing Fed. R. Civ. P. 56(c)).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Where, as here, the movant seeks summary judgment on a claim or issue on which the non-movant bears the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun*, 509 F.3d at 984; *see also Lujan v. National Wildlife* Fed'n, 497 U.S. 871, 888-89 (1990).

Under the APA, agency action must be upheld, unless it is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A court may not set aside agency action that "is rational, based on consideration

30

of the relevant factors and within the scope of authority delegated to the agency by the statute...."  The scope of review under the 'arbitrary and capricious' standard is narrow, and a court is not to substitute its judgment for t hat of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983).  The scope of judicial review is limited to the Administrative Record before the agency at the time the challenged decision was made.  *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).

Where, as here, the claim for relief is that a federal agency failed to consult under ESA § 7, there is no administrative record of a consultation to limit the court's scope of review.  *See Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005) ("Because [the ESA] independently authorizes a private right of action, the APA does not govern the plaintiff's claims [for failure to consult].  Plaintiff's suits to compel agencies to comply with the substantive provisions of the ESA arise under the ESA citizen suit provision, and not the APA." (citations omitted)).

## V. DISCUSSION

A.   Elements of an ESA Section 7 Claim.

To prevail on a claim against a federal agency under ESA Section 7(a)(2), the plaintiff must establish that the agency has "authorized, funded, or carried out" "any action" without the

benefit of consultation.  *See* 16 U.S.C. § 1536(a)(2).  NMFS and FWS have interpreted "action" to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas."  50 C.F.R. § 402.02 (emphasis added).  "Examples [of agency action] include, but are not limited to ... actions intended to conserve listed species or their habitat; ... the promulgation of regulations; ... [¶] or ... actions directly or indirectly causing modifications to the land, water, or air."  *Id*.

Second, the agency action must be one that "may affect" listed species or critical habitat.  50 C.F.R. § 402.14(a).  If an agency action may affect the Listed Species or their critical habitat, even in a beneficial way, consultation is required. *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018-19 (2009) (citing 51 Fed. Reg. 19,926, 19,949 (June 3, 1996) ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement....")).  However, where the action will not affect the listed species at all, the consultation duty is not triggered.  *See S.W. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447-48 (9th Cir. 1996).

B.    **Does the Statute of Limitations bar Plaintiffs' Challenge to FEMA's Implementation of the Floodplain Management Criteria.**

Because the ESA contains no express statute of limitations,

the applicable statute of limitations is found in title 28 U.S.C. § 2401(a), the general statute of limitations for civil actions against the federal government.  *See Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154, 1160 (D. Or. 2001).  Section 2401(a) provides: "Every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."

   "Under federal law a cause of action accrues when the plaintiff is aware of the wrong and can successfully bring a cause of action."  *Acri v. Intl. Ass'n of Machinists*, 781 F.2d 1393, 1396 (9th Cir. 1986).  "Publication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance."  *Shiny Rock Mining Corp. v. United States*, 906 F.2d 1362, 1364 (9th Cir. 1990) (internal citation and quotation omitted).

   FEMA admits that FEMA's <u>promulgation</u> of the regulations containing the minimum floodplain management criteria, 44 C.F.R. §§ 60.3-60.5, is the type of affirmative "action" that can trigger a duty to consult under the ESA.  *See* 50 C.F.R. § 402.02 (defining "action" to include "the promulgation of regulations").  However, it is undisputed that these regulations were promulgated in 1976 and last substantively amended in 1997.  *See* 41 Fed. Reg. 46,975 (Oct. 26, 1976); 62 Fed. Reg. 55,706, (Oct. 27, 1997).  Any challenge to the <u>promulgation</u> of those regulations is barred

33

by the six-year statute of limitations.

The statute of limitations also bars any substantive challenge by Plaintiffs to the <u>validity</u> of the regulations themselves. "After the six-year limitations period has expired, a challenge to the validity of an agency's rule can only be attacked in two ways: (1) through an 'as applied' challenge requesting judicial review of the agency's adverse application of the rule to the particular challenger, or (2) by petitioning the agency for amendment or rescission of the rule and then appealing the agency's decision." *Oksner v. Blakey*, 2007 WL 3238659, at *6 (N.D. Cal. Oct. 31, 2007) (citing *Wind River Min. Corp. v. United States*, 946 F.2d 710, 715 (9th Cir. 1991)).

FEMA has not taken any action applying the NFIP regulations to <u>Plaintiffs</u>. Plaintiffs maintain instead the statute of limitations does not bar this action because FEMA continues to administer and enforce the regulations by providing technical advice, conducting community visits, reviewing participating communities' land management ordinances, and retaining authority to suspend a community for noncompliance. *See* TAC ¶ 75.

Federal Defendants cite *Cedars-Sinai Medical Ctr. v. Shalala*, 177 F.3d 1126 (9th Cir. 1999), for the proposition that "allowing suit whenever a regulation was administered by a federal agency would virtually nullify the statute of limitations for challenges to agency orders." *Id*. at 1129 (internal quotations and citations omitted). However, *Cedars-Sinai* is an

34

APA case in which Plaintiffs challenged <u>procedural</u> errors in the promulgation of a regulation, a cause of action that accrues upon the issuance of the rule. *Id*. The Ninth Circuit rejected the argument that the cause of action did not accrue until the administrative agency applied the challenged regulations to the hospital appellees. *Id. Cedars-Sinai* is not dispositive in this case. Here, Plaintiffs do not challenge the validity of the rules themselves, but rather whether FEMA's implementation of those rules is subject to the consultation requirements set forth in the ESA.

More relevant here are a series of cases applying the ESA to "ongoing" agency programs. These cases fall into two broad categories:

> (1) where the agency retains discretion under a plan or program to act on behalf of listed species and thereafter continues to act pursuant to that discretion on an ongoing basis, *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994); *Washington Toxics Coalition v. EPA*, 413 F.3d 1024, 1032 (9th Cir. 2005); *Turtle Island Restoration Network v. NMFS*, 340 F.3d 969, 977 (9th Cir. 2003); and

> (2) where the agency either has not retained <u>any</u> discretion to act on behalf of the species or the nature of any discretion retained is <u>insufficient to constitute discretionary "involvement or control"</u> that

might trigger a consultation obligation, *Karuk Tribe of Cal. v. U.S. Forest Service*, 640 F.3d 979 (9th Cir. 2011); *Cal. Sportfishing Protection Alliance v. FERC*, 472 F.3d 593 (9th Cir. 2006); *Western Watersheds Project v. Matejko*, 468 F.3d 1099 (9th Cir. 2006); *Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 2005); *Envt'l Protection Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001) ("*EPIC*").[6]

*See Center for Biological Diversity v. Chertoff*, 2009 WL 839042, *5 (N.D. Cal. 2009) (reviewing caselaw and generally defining the two categories described above).

        1.    Ongoing Agency Action Cases.

    *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994), concerned a 1990 Long Range Management Plan ("LRMP") promulgated under the National Forest Management Act, 16 U.S.C. §§ 1600-1614, *et seq.*, for two National Forests in Oregon.  After the 1992 listing of the Snake River Chinook salmon as threatened under the ESA, an environmental organization sued the Forest Service, arguing that the agency was not complying with its duty

---

[6] Federal Defendants attempt to distinguish *Pacific Rivers*, *Washington Toxics*, and *Turtle Island* on the ground that the statute of limitations was not at issue in any of those cases.  However, *Pacific Rivers* and its progeny create an "ongoing agency action" doctrine that, when appropriate, precludes application of the six year statute of limitations to actions that are ongoing at the time a complaint is filed.  *See Cloud Foundation Inc. v. Kempthorne*, 546 F. Supp. 2d 1003, 1011 (D. Mont. 2008) (acknowledging that *Pacific Rivers* stands for the proposition that certain management plans "governing future and ongoing projects may constitute continuing agency action" not subject to the six year statute of limitations); *Center for Biological Diversity v. Chertoff*, 2009 WL 839042 (N.D. Cal. 2009)(same).  The more pertinent question is which of the two lines of authority controls here.

to consult with NMFS over the impacts of the LRMP on the species.
*Id.* at 1052-53.  The Ninth Circuit rejected the Forest Service's
argument that LRMPs are not agency actions under § 7(a)(2):

> The LRMPs are comprehensive management plans governing
> a multitude of individual projects. Indeed, every
> individual project planned in both national forests
> involved in this case is implemented according to the
> LRMPs. Thus, because the LRMPs have an ongoing and
> long-lasting effect even after adoption, we hold that
> the LRMPs represent ongoing agency action. We affirm
> the district court's decision requiring the Forest
> Service to consult with the NMFS as required under the
> ESA, 16 U.S.C. § 1536(a)(2).

*Id.* at 1053.  A broad definition of "action" under the ESA was
adopted:

> [A]s the Supreme Court emphasized in *TVA v. Hill*, 437
> U.S. 153, 173 (1978), "one would be hard pressed to
> find a statutory provision whose terms were any plainer
> than those in § 7 of the [ESA]." The ESA's plain
> language affirmatively commands all federal agencies to
> "insure that any action authorized, funded, or carried
> out by such agency ... is not likely to jeopardize the
> continued existence of any endangered species or
> threatened species or result in the destruction or
> adverse modification of habitat of such species...." 16
> U.S.C. § 1536(a)(2) (emphasis added). "This language
> admits of no exception." *TVA*, 437 U.S. at 173. The
> regulations defining agency action also admit of no
> limitations:

>> Action means all activities or programs of any
>> kind authorized, funded, or carried out, in whole
>> or in part, by Federal agencies in the United
>> States or upon the high seas. Examples include,
>> but are not limited to:

>>> (a) actions intended to conserve listed
>>> species or their habitat;

>>> (b) the promulgation of regulations;

>>> (c) the granting of licenses, contracts,
>>> leases, easements, rights-of-way, permits, or

37

1              grants-in-aid; or

2                   (d) actions directly or indirectly causing
3                   modifications to the land, water, or air.

4         50 C.F.R. § 402.02 (emphasis added).

5              In short, there is little doubt that Congress intended
               to enact a broad definition of agency action in the
6              ESA, and therefore that the LRMPs are continuing agency
               action. Indeed, the Supreme Court has interpreted the
7              plain meaning of agency action broadly, in conformance
               with Congress's clear intent, in a case that presents
8              striking similarities to this case. In *TVA v. Hill*, the
               Court rejected the Tennessee Valley Authority's
9              contention that the ESA did not apply to a federal
               project (a $102 million dollar dam) that was well under
10             way when Congress passed the ESA in 1973. *TVA*, 437 U.S.
               at 173. The Court noted that "[t]o sustain [this]
11             position ... we would be forced to ignore the ordinary
               meaning of [the] plain language [in § 7(a)(2) ]." *Id*.
12             Although the dam had been planned and approved years
               before the passage of the ESA, the Court found that
13             TVA's operation of the dam constituted agency action,
               and it enjoined the dam's operation. *Id*. The Court
14             recognized that its reading of the ESA would produce
               results requiring the sacrifice of many millions of
15             dollars in public funds. But it asserted that "Congress
               has spoken in the plainest of words, making it
16             abundantly clear that the balance has been struck in
               favor of affording endangered species the highest of
17             priorities, thereby adopting a policy which it
               described as 'institutionalized caution.' " *Id*. at 194.
18
19
20   *Id*. at 1053-55 (emphasis added, footnotes omitted).   The Ninth
21
22   Circuit also rejected the Forest Service's argument that LRMP are
23   agency actions only at the time they are adopted, revised, or
24   amended.
25             In this action, the Forest Service makes ... the ...
               argument[] that the ESA does not apply to programs or
26             activities undertaken before the listing of a species.
               It argues that it is not required to reinitiate
27             consultation because the LRMPs are not continuing
               agency actions, but are agency actions only at the time
28             they are adopted, revised, or amended. It further

                                  38

1
2
3
4

maintains that the existence of the LRMPs by themselves are not agency actions. Rather, only the specific activities authorized by the LRMPs are agency actions within the meaning of the ESA. The LRMPs themselves, the Service argues, do not mandate any action and are "merely" programmatic documents.

5
6
7
8
9

However, the Forest Service can cite no precedent of this or any other court which lends support to such a reading of the statute. And as shown above, TVA weighs heavily against the Forest Service on this point, as is evident from the TVA Court's observation that "Congress foresaw that § 7 would, on occasion, require agencies to alter ongoing projects in order to fulfill the goals of the Act." *Id.* at 186.

10
11
12
13
14
15
16
17
18
19
20

Following the Supreme Court's lead in *TVA*, we have also construed "agency action" broadly. *See Lane County Audubon Soc'y v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992); *Conner v. Burford*, 848 F.2d 1441, 1452 (9th Cir. 1988), cert. denied, 489 U.S. 1012 (1989). More importantly, we have recognized that forest management plans have ongoing effects extending beyond their mere approval. In Lane County, we found that a forest management plan implemented without consultation violated the ESA. Although the management plan in that case was implemented after the listing of the threatened species, our reasoning is relevant. We stated that the "[forest management plan] is action that 'may affect' the spotted owl, since it sets forth criteria for harvesting owl habitat." *Lane County*, 958 F.2d at 294. Thus, we implicitly recognized that forest management plans can be actions even after their implementation.

\*\*\*

21
22
23
24
25

Given the importance of the LRMPs in establishing resource and land use policies for the forests in question there is little doubt that they are continuing agency action under § 7(a)(2) of the ESA. The fact that the Forest Service adopted these LRMPs before the listing of the Snake River chinook is, therefore, irrelevant. We affirm the district court's order requiring the Forest Service to reinitiate consultation under § 7(a)(2)

26
27

*Id.* at 1055-56 (emphasis added, footnotes omitted).[7] [8]

28

---

[7] The Ninth Circuit's conclusion that ongoing implementation of an LRMP is

39

1   *Turtle Island Restoration Network v. NMFS*, 340 F.3d 969 (9th

2   Cir. 2003) concerned the High Seas Fishing Compliance Act

3   ("Compliance Act"), passed in 1995 to implement various

4   international conventions applicable to fishing vessels on the

5

6   "action" for purposes of the ESA has been expressly rejected by the Tenth
    Circuit, which reasoned that:

7       Contrary to *Pacific Rivers*, our analysis makes painfully apparent that
8       "standards," "guidelines," "policies," "criteria," "land designations,"
        and the like appearing within a LRMP do not constitute "action"
        requiring consultation under § 7(a)(2) of the ESA. A contrary view would
9       be the equivalent of saying that agency regulations constitute ongoing
        action because such regulations continually affect what goes on in the
10      forest. Of course, the very definition of "action" in § 402.02 tells us
        that the "promulgation of regulations," not the regulations themselves,
11      constitutes "action." 50 C.F.R. § 402.02 (emphasis added). We have no
        quarrel with the proposition that LRMPs may have "an ongoing and long-
12      lasting effect" on the forest. That's the very purpose of a LRMP—to
        guide management decisions regarding the use of forest resources and to
13      establish to a substantial degree what is permitted to occur within the
        forest. But this does not alter our conclusion that the entirety of
14      LRMPs do not constitute § 7 "action." Instead, "activities or programs
        ... authorized, funded, or carried out," by the Forest Service are the
15      "action" of which § 7(a)(2) speaks. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §
        402.02. A LRMP simply does not fit within this definition.

16  *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1159 (10th Cir. 2007) (footnote
    omitted).

17
18  [8] FEMA attempts to distinguish *Pacific Rivers* and its progeny on the grounds
    that the LRMP in *Pacific Rivers* indisputably and directly dictated the terms
    of hundreds of ongoing federal activities on federal lands that affected
19  listed species.  Here, by contrast, Plaintiffs complain that FEMA's ongoing
    administration of the NFIP will indirectly influence the actions of third
20  parties.  *See* Doc. 129 at 31.  This is a distinction without a difference
    under the ESA.  The ESA's implementing regulations define "effects of the
21  action" as follows:

22      Effects of the action refers to the direct and <u>indirect</u> effects of an
        action on the species or critical habitat, together with the effects of
        other activities that are interrelated or interdependent with that
23      action, that will be added to the environmental baseline.... Indirect
        effects are those that are caused by the proposed action and are later
24      in time, but still are reasonably certain to occur....

25  50 C.F.R. § 402.02; *see also Florida Key Deer* v. Paulison, 522 F.3d 1133, 1142
    (11th Cir. 2008) (citing § 402.02 to reject similar argument that the issuance
26  of flood insurance is not a legally relevant "cause" of development that
    threatened the listed Florida Key Deer).  Plaintiffs' claims are not barred as
27  a matter of law simply because they allege that a federal action indirectly
    causes third parties to harm listed species.

28

40

high seas.  *Id*. at 973 (citing 16 U.S.C. § 5501).  The Compliance Act requires American vessels to obtain permits to engage in fishing operations on the high seas and authorizes NMFS to promulgate regulations implementing the act.  *Id*. (citing 16 U.S.C. §§ 5504-5506).  The Ninth Circuit examined the language of the Compliance Act:

> The plain language of the Compliance Act provides Fisheries Service with ample discretion to protect listed species. The intent of the Compliance Act was to implement the "Agreement to Promote Compliance with International Conservation and Management Measures by Fishing Vessels on the High Seas" and "to establish a system of permitting, reporting, and regulation for vessels of the United States fishing on the high seas." 16 U.S.C. § 5501. The "Conditions" subsection provides that "[t]he Secretary shall establish such conditions and restrictions on each permit issued under this section as are necessary and appropriate to carry out the obligations of the United States under the Agreement, including but not limited to " the markings of the boat and reporting requirements. 16 U.S.C. § 5503(d) (emphasis added).

*Id*. at 975-76.  The Ninth Circuit reasoned that NMFS's "continuing issuance of fishing permits" under the Compliance Act "constitutes ongoing agency action" and that the Compliance Act "entrusts [NMFS] with substantial discretion to condition permits to inure to the benefit of the listed species."  *Id*. at 976; *see also Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1213 (9th Cir. 1999) (explaining "well-settled" rule that "contractual arrangements can be altered by subsequent Congressional legislation" so long as the federal agency retains some measure of control over the activity); *NRDC v. Houston*, 146

F.3d 1118, 1125 (9th Cir. 1998) (section 7(a)(2) applies to negotiating and executing water contracts, where agency retained discretion to change previously negotiated terms).

*Washington Toxics Coalition v. EPA*, 413 F.3d 1024, 1032 (9th Cir. 2005), concerned EPA's process of registering pesticide active ingredients under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). EPA argued that once a pesticide has been approved for use under FIFRA, the agency lacked discretion to meet any other legal obligations with respect to that registration. *Id*. at 1032-33. Following *Pacific Rivers* and *Turtle Island*, the Ninth Circuit disagreed, reasoning that EPA did in fact retain ongoing discretion to alter and/or cancel pesticide registrations. *Id*. at 1033. Therefore, EPA has a continuing obligation to apply the requirements of the ESA to the registered pesticides. *Id*.

    2.   *EPIC*, *Sierra Club*, *Western Watersheds*, *CSPA*, and *Karuk Tribe.*

A separate line of cases refused to find ongoing agency action. *Environmental Protection Information Center v. Simpson Timber Company*, 255 F.3d 1073 (9th Cir. 2001) ("*EPIC*"), concerned an allegation that FWS violated section 7 by refusing to reinitiate consultation with itself about the effect that an incidental take permit ("ITP") issued to a private timber company for the northern spotted owl might have on two other species, listed after the ITP was issued. *Id*. at 1074-75. As part of its

1    application for the ITP, the timber company was required to

2    submit a Habitat Conservation Plan ("HCP") and Implementation

3    Agreement ("IA"), which contained detailed requirements to

4    minimize and mitigate impacts to the species.  *Id*. at 1076-77.

5    These documents were incorporated into the ITP.  *Id*. at 1077.

6    EPIC argued that the HCP reserved to FWS discretionary

7    involvement and control such that it must reconsult on the impact

8    of the ITP to the newly-listed species.  *Id*. at 1080.  After

9    reviewing the language of the HCP in detail, the Ninth Circuit

10   concluded "none of the provisions of the HCP or IA gives the FWS

11   the power to reinitiate consultation on [the] spotted owl permit

12   to impose measures to protect the marbled murrelet or coho

13   salmon."  *Id*. at 1082.

14   *Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 2005),

15   addressed the Bureau of Land Management's ("BLM") failure to

16   consult with FWS about a proposed logging road's effect on the

17   northern spotted owl.  A private timber company planned to build

18   a road on public land pursuant to a previously approved

19   reciprocal right-of-way agreement with the BLM.  Environmental

20   plaintiffs claimed BLM retained discretionary involvement and

21   control over the right-of-way agreement, representing ongoing

22   agency action requiring consultation over the potential impact of

23   the road on the spotted owl, a then newly listed species.  Under

24   the right-of-way agreement, the BLM had three limited rights of

25   objection to the timber company's project, none of which related

43

to endangered or threatened species.  *Id.* at 1509 n.10.  The
Ninth Circuit found BLM had no duty to consult with FWS, because
it could not influence construction of the roadway for the
benefit of the spotted owl:

> In light of the statute's plain language, the agency's
> regulations, and the case law construing the scope of
> "agency action," we conclude that where, as here, the
> federal agency lacks the discretion to influence the
> private action, consultation would be a meaningless
> exercise; the agency simply does not possess the
> ability to implement measures that inure to the benefit
> of the protected species.

*Id.* at 1509.

    *Western Watersheds Project v. Matejko*, 468 F.3d 1099 (9th
Cir. 2006), concerned private parties' vested rights-of-way to
access and use water on BLM land.  The BLM promulgated
regulations in 1986, recognizing those vested water rights as
authorized uses of public land, without requiring further action
by the private rights holder or BLM.  *See id.* at 1104-05.
Amendments to those regulations required vested rights holders to
obtain BLM permission if a use or activity resulted in a
"substantial deviation" from the original right.  *Id.* at 1105.  A
later clarification provided that if a vested right holder failed
to approach BLM for a permit authorizing a "substantial
deviation," BLM retained the discretion to take an enforcement
action against that rights-holder.  *Id.* at 1106 (citing 70 Fed.
Reg. 20,980).  In light of this retained discretion, the district
court concluded that the ESA requires BLM to consult with the

appropriate wildlife agency "over its decision not to impose

conditions on certain water diversions." *Id.*  The Ninth Circuit

reversed, focusing on the reasoning in *Defenders of Wildlife v.*

*EPA*, 420 F.3d 949 (9th Cir. 2005):

> Although the term "agency action" is to be construed
> broadly, *see Natural Res. Def. Council v. Houston*, 146
> F.3d 1118, 1125 (9th Cir. 1998), Ninth Circuit cases
> have emphasized that section 7(a)(2) consultation stems
> only from "affirmative actions." *Defenders of Wildlife*
> repeatedly emphasized that section 7(a)(2) consultation
> stems from "affirmative" actions only. It found a duty
> to consult under section 7(a)(2) in an EPA decision to
> approve a transfer of a Clean Water Act permitting
> program from federal to state control. Most important
> for present purposes, the opinion studied section
> 7(a)(2), analyzed Ninth Circuit case law, and
> emphasized (over and over) that "action" under section
> 7(a)(2) must be "affirmative." *Id.* at 967 ("section
> 7(a)(2) specifies that agencies must when acting
> affirmatively refrain from jeopardizing listed
> species") [].
>
> Interpreting section 7(a)(2), the opinion explained
> that "the [ESA] confers authority and responsibility on
> agencies to protect listed species when the agency
> engages in an affirmative action that is both within
> its decisionmaking authority and unconstrained by
> earlier agency commitments." *Id.* (emphasis added). The
> "language does indicate that some agency actions are
> not covered-those the agency does not 'authorize[ ],
> fund[ ], or carr[y] out.' " *Id.* ([]alterations in
> original). It restates the question as whether agencies
> must "protect listed species from the impact of
> affirmative federal actions." *Id.* at 970 (emphasis
> added). It characterizes section 7(a)(2) as "a do-no-
> harm directive pertaining to affirmative agency action
> with likely adverse impact on listed species." *Id.*
> (emphasis added). It held that the approval of the
> transfer of Clean Water Act permitting authority
> triggered section 7(a)(2)'s "consultation requirement
> and its mandate that agencies not affirmatively take
> actions that are likely to jeopardize listed species."
> *Id.* at 971 (emphasis added). In short, *Defenders of*
> *Wildlife* provides that "inaction" is not "action" for
> section 7(a)(2) purposes. That is, even assuming the

1
2
3

> BLM could have had some type of discretion here to
> regulate the diversions (beyond a "substantial
> deviation"), the existence of such discretion without
> more is not an "action" triggering a consultation duty.

4  *Id.* at 1108 (emphasis added).

5       The Ninth Circuit specifically distinguished *Turtle Island*

6  as a case involving true "affirmative" action:

7
8
9
10
11

> The BLM's challenged "action" stands in marked contrast
> to cases involving truly "affirmative" actions. *See
> Turtle Island Restoration Network*, 340 F.3d at 977
> (holding that section 7(a)(2) applies to the "continued
> issuance of fishing permits") and *Houston*, 146 F.3d at
> 1125-26 (reasoning that section 7(a)(2) applies to
> negotiating and executing water contracts, where agency
> was not bound to reaffirm previously negotiated terms).

12
13
14
15
16
17
18

> Here, the BLM did not fund the diversions, it did not
> issue permits, it did not grant contracts, it did not
> build dams, nor did it divert streams. Rather, the
> private holders of the vested rights diverted the
> water, beginning a long time ago. The BLM did not
> affirmatively act and was "not an entity responsible
> for [the challenged] decisionmaking." *Defenders of
> Wildlife*, 420 F.3d at 968 (citing *Washington Toxics
> Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1033 (9th
> Cir.2005)).

19
20
21

Id. at 1109.  Critical was the fact that the relevant regulations

restricted BLM's power to act, as opposed to situations in which

the agency possessed "continuing decisionmaking authority":

22
23
24
25
26
27
28

> Western Watersheds would find "affirmative" action in
> the BLM's continuing decision not to enforce its
> regulatory discretion. In this regard, 50 C.F.R. §
> 402.03, provides "Section 7 and the requirements of
> this Part apply to all actions in which there is
> discretionary Federal involvement or control." Assuming
> the BLM had some "discretionary" authority over 1866
> and 1891 rights-of-way, the "action" is-according to
> Western Watersheds-the act of continuing to follow a
> policy expressed in then-existing BLM regulations
> promulgated in 1986 (43 C.F.R. § 2803.2(b) (2004)),
> which restrict the BLM's power unless there is a

46

"substantial deviation in location or authorized use" of a vested right-of-way.

It is true that "[w]here the challenged action comes within the agency's decisionmaking authority and remains so, it falls within section 7(a)(2)'s scope." *Defenders of Wildlife*, 420 F.3d at 969 (emphasis added). However, there is no "ongoing agency action" where the agency has acted earlier but specifically did not retain authority or was otherwise constrained by statute, rule, or contract. For example, in *Environmental Protection Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1082 (9th Cir. 2001), the Ninth Circuit found no section 7(a)(2) consultation requirement where the FWS had already issued a permit but had not retained discretion to amend it to protect endangered species. There was no "ongoing agency involvement" because the FWS had not "retained the power to 'implement measures that inure to the benefit of the protected species.' " *Id.* at 1080 ....

On the other hand, there was such "continuing decisionmaking authority" in *Washington Toxics*, where the EPA had a continuing duty "to register pesticides, alter pesticide registrations, and cancel pesticide registrations" under the Federal Insecticide, Fungicide and Rodenticide Act. 413 F.3d at 1033. "Ongoing agency action" also existed in *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th Cir. 1994), where the Forest Service maintained continuing authority under a comprehensive and long term management plan, that was still in effect. And in *Turtle Island Restoration Network*, the Ninth Circuit found the requisite residual discretionary authority where the NMFS had retained discretion in its previously-granted fishing permits specifically to protect species. 340 F.3d at 977. In those types of cases, there is a duty to consult.

Here, even if the BLM could have regulated the diversions to protect endangered species, it did not retain such discretion. As the 1983 instruction memorandum, the 1986 regulations, and the recently-enacted 2005 regulatory amendments make clear, the only discretion the BLM retained is to regulate the pre-1978 diversions if there is a "substantial deviation in use or location." The BLM has the ability to institute enforcement or trespass actions if a right-of-way holder "substantially deviates" and does not obtain BLM approval. *See* 43 U.S.C. § 1733 and 43 C.F.R. § 2808.11

47

(2005); 70 Fed. Reg. at 21078. It also has the ability to institute an ESA § 9 (16 U.S.C. § 1538) "taking" action to prevent harm.  But even this power is not ongoing "discretionary involvement or control" within the meaning of 50 C.F.R. § 402.03. *See Marbled Murrelet*, 83 F.3d at 1074 ("there is no evidence that the USFWS had any power to enforce those conditions other than its authority under section 9 of the ESA, and this is not enough to trigger 'federal action' under section 7"). In short, the BLM has no retained power to "inure to the benefit of the protected species." *Sierra Club*, 65 F.3d at 1509.

*Id*. at 1109-1110.  This does not fully explain how the rule articulated in *Pacific Rivers* and *Washington Toxics* -- that "ongoing agency action" exists where the agency retains "continuing decisionmaking authority" -- relates to the newly-articulated and overlapping "affirmative action" rule.

Federal Defendants also cite *California Sportfishing Protection Alliance v. FERC*, 472 F.3d 593 (9th Cir. 2006) ("*CSPA*"), a challenge to FERC's refusal to initiate formal consultation with NMFS over the ongoing operation of a hydroelectric plant operated under a 30-year license from FERC. FERC could unilaterally institute proceedings to amend the license under license terms authorizing FERC to modify the license to reflect changing environmental concerns.  *Id*. at 595. The Ninth Circuit emphasized, however, that "[t]he ESA and the applicable regulations ... mandate consultation with NMFS only before an agency takes some <u>affirmative agency action</u>, such as issuing a license."  *Id*. at 595 (emphasis added).  The Ninth Circuit concluded "the agency action of granting a permit is

48

1    complete."  *Id.* at 598.

2                 The ongoing activity is that of PG & E operating
3                 pursuant to the permit. Plaintiffs in this case are not
                  challenging an ongoing program of issuing new permits
4                 that underlay our decision in *Turtle Island*.

5    *Id.*

6         The Ninth Circuit found FERC's actions "materially the same"

7    as the BLM's actions in *Western Watersheds* because "PG & E, a

8    private party, operates the hydroelectric project challenged in

9    this case" and "FERC, the agency, has proposed no affirmative act

10   that would trigger the consultation requirement for current

11   operations."  *CSPA* distinguished *Pacific Rivers*:

12
13                 *Pacific Rivers* involved certain Land and Resource
                  Management Plans ("LRMPs") governing thousands of
14                 different projects in two national forests. *Id.* at
                  1052. After the Forest Service adopted the LRMPs, the
15                 Chinook was listed as a threatened species. *Id.* We held
                  that the Forest Service had to initiate formal
16                 consultation on the LRMPs because they affected each
                  future project planned in the forests. *Id.* at 1053. We
17                 observed that "every individual project planned in both
                  national forests ... is implemented according to the
18                 LRMPs." *Id.* Because they continued to apply to new
                  projects, we concluded that "the LRMPs have an ongoing
19                 and long-lasting effect even after adoption," and
                  represented "on-going agency action." *Id.*
20
21                 Unlike *Pacific Rivers*, this case involves no such long-
                  lasting effects on new permits. The action was
22                 concluded in 1980 when FERC issued the license to PG &
                  E.
23

24   *Id.* (emphasis added).  *CSPA* seeks to reconcile the *Pacific Rivers*

25   line of cases with the new "affirmative action rule" articulated

26   in *Western Watersheds,* by recognizing that the *Pacific Rivers'*

27   LRMP has an affirmative effect on every project planned in the

28

1    covered national forests.

2        *Karuk Tribe of Cal. v. United States Forest Service*, 640
3    F.3d 979, 985-86 (9th Cir. 2011) exemplifies how the "affirmative
4    action" test should be applied.  *Karuk Tribe* addressed the Forest
5    Service's practice of requiring private parties conducting mining
6    activities within national forests to submit a "notice of intent
7    to operate" ("NOI") to the District Ranger.  *Id*. at 986.  Upon
8    receipt of an NOI, the Ranger decides whether the described
9    activities are likely to significantly disturb surface resources.
10   *Id*.  If so, the private party must submit a Plan of Operations
11   ("Plan"), which the Ranger must approve before any mining
12   activity may proceed.  *Id*.  Plaintiffs specifically challenged
13   the Ranger's decision to "accept" several NOIs without an ESA
14   consultation about the mining's effects on listed species.  *Id*.
15   Plaintiffs did not challenge the Ranger's determination that the
16   proposed activities did not require preparation of a Plan, nor
17   did they challenge the Forest Service's adoption of the
18   regulatory scheme.  *Id*.  The Karuk tribe argued filing an NOI is
19   a legal prerequisite to new mining activities, and that the
20   Ranger's decision to allow the described suction dredging
21   activities is an agency "authorization."  *Id*. at 988.  The Forest
22   Service rejoined it has no power to "authorize" mining activities
23   described in an NOI "because the miners already possess the right
24   to mine under the mining laws, and that the permits to engage in
25   such mining are granted by other state and federal bodies."  *Id*.

50

The Ninth Circuit reasoned the issue "depends on the proper characterization of what the USFS does with respect to an NOI and the activities described therein." *Id.* Rejecting the Tribe's position:

> the NOI process is not "authorization" of private activities when those activities are already authorized by other law. Rather, it is merely a precautionary agency notification procedure, which is at most a preliminary step prior to agency action being taken. The USFS acts in the sense claimed by the Tribe only in approving a Plan. The Tribe's statement that the "Ranger determines whether mining should be regulated under a[n] NOI or [Plan]," is inaccurate. Mining is not "regulated" under an NOI because an NOI is not a regulatory document. The Ranger's response to an NOI— which is not even required by statute or regulation—is analogous to the NOI itself, a notice of the agency's review decision. It is not a permit, and does not impose regulations on the private conduct as does a Plan.

*Id.* at 990. "The duty to consult is triggered by affirmative actions." *Id.*

> In other words, "authorization" under the ESA and its implementing regulations means affirmative authorization of the activity, in the manner of granting a license or permit, as opposed to merely acquiescing in the private activity. Thus, in [*Western Watersheds*] we held that the Bureau of Land Management's (BLM) "acquiescence" in private parties' diversions of water was not an agency action under the ESA.

*Id.*

3.   *NWF v. NMFS.*

One non-binding 2004 district court decision that pre-dates *Western Watersheds*, *CSPA*, and *Karuk Tribe*, found *Pacific Rivers* applicable to FEMA's implementation of the NFIP in Puget Sound.

In *National Wildlife Federation v. FEMA*, 345 F. Supp. 2d 1151 (W.D. Wash. 2004) ("*NWF v. NMFS*"), environmental plaintiffs alleged FEMA violated ESA Section 7(a)(2) by not consulting with NMFS on the impacts of the NFIP on Puget Sound Chinook salmon, an ESA listed species.  *Id*. at 1153-54.  The *NWF v. NMFS* plaintiffs analogously "contend[ed] that FEMA's implementation of the NFIP constitutes an agency action that may affect the Puget Sound Chinook salmon because some aspects of the NFIP encourage development in the floodplains, and the floodplains of the Puget Sound provide important habitat for the salmon."  *Id*. at 1154. The district court in *NWF v. FEMA* first concluded that the NFIP is a "program carried out" by FEMA:

> The NFIP is a program carried out by FEMA. The NFIP involves the promulgation of regulations (i.e., the minimum eligibility criteria), providing insurance, and actions that indirectly cause modifications of the land and water (e.g., FEMA's mapping of floodplains determines the applicability of local land use regulations, and FEMA's CRS provides incentives to modify the floodplains in certain ways). Accordingly, the NFIP falls within the broad definition of "agency action" to which Section 7(a)(2) applies. *See TVA v. Hill*, 437 U.S. at 173, 98 S.Ct. 2279 (Section 7(a)(2)'s language "admits of no exception"); *Natural Res. Def. Council ("NRDC") v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998) ("The term 'agency action' has been defined broadly"); *Pacific Rivers Council*, 30 F.3d at 1055 ("Following the Supreme Court's lead in TVA, [the Ninth Circuit] ha[s] also construed 'agency action' broadly.").

*Id*. at 1169.  The next inquiry was  whether FEMA's "carrying out" of the NFIP involved "discretionary Federal involvement or control."  The *NWF v. NMFS* district court  summarized *Sierra Club*

*v. Babbitt*, *NRDC v. Houston*, *Pacific Rivers*, *Turtle Island*, and *EPIC*, the law as of 2004:

> Neither *[EPIC]* nor *Sierra Club v. Babbitt* control in the present case because the "agency action" in both of these cases involved a contract between a federal agency and a private entity. In each case, the contract had been completed at the time the plaintiffs sought to require consultation, and there was no contract term that authorized the agency to intervene for the benefit of protected species. The terms of the contract in those cases determined the existence and nature of the agency's discretion. Therefore, the agency action in both cases was completed and there was no ongoing agency action. In the present case, there is no contract; thus, the Court looks to the enabling statute to determine whether the agency has discretion, as was the case in *Turtle Island Restoration Network* and *NRDC v. Houston*. Moreover, the NFIP influences the management of an entire ecosystem (i.e., floodplains) on an ongoing basis, just as the LRMPs in Pacific Rivers Council guided resource management on forest lands. <u>The Court concludes that the present case involves a continuing agency action akin to the LRMPs in *Pacific Rivers* [] because, like the LRMPs, FEMA's passage of the minimum eligibility criteria, the mapping of floodplains, and the implementation of the CRS have ongoing effects extending beyond their mere approval. Like the LRMPs, FEMA's actions in implementing, monitoring, and enforcing the NFIP can be actions subject to ESA consultation even though some of the regulations and programs were adopted before the listing of the Puget Sound chinook salmon in 1999</u>.

> *Turtle Island Restoration Network* requires further discussion. This case held that the agency had discretion to act for the benefit of protected sea turtles based on the enabling statute's enumerated purpose to increase the effectiveness of "international conservation and management measures," expressly defined by the statute as "measures to conserve or manage one or more species of living marine resources." 340 F.3d at 976. The Ninth Circuit noted that "one such measure is the Inter-American Convention for the Protection and Conservation of Sea Turtles, which was designed to promote the protection ... of sea turtle populations." *Id*. The Ninth Circuit reversed the district court's "no discretion" holding. The Ninth

53

Circuit clarified its holding by noting that "[w]hether the Fisheries Service must condition permits to benefit listed species is not the question before this court, rather, the question before us is whether the statutory language of the [enabling statute] confers sufficient discretion to the Fisheries Service so that the agency could condition permits to benefit listed species." *Id.* at 977 (emphasis in original).

This is a subtle but important distinction that is also demonstrated by the holding in *NRDC v. Houston*, a case in which the Federal Reclamation Laws gave the Bureau of Reclamation the ability to renew 40 year water service contracts on "mutually agreeable terms," determined that water rights were based on the amount of available project water and gave the Secretary of the Interior the discretion to set water rates to cover "an appropriate share" of the cost of maintenance and operation. 146 F.3d at 1126. The Ninth Circuit held that this enabling statute gave the Bureau of Reclamation discretion to reduce the total amount of water available to water rights holders, which, in turn, could allow more water to be available for listed salmon. See id. The Ninth Circuit in *NRDC v. Houston* did not require the statute to have as one of its stated purposes the protection of the environment, wildlife or endangered species. The key was whether the agency had discretion to act in a manner that could benefit the listed species, which it did because it could adjust the amount of water available to water rights holders to accommodate increased flows for salmon. The court also noted that the Bureau of Reclamation had discretion to act for the benefit of the listed species based on the federal law mandating the Bureau to renew the water contracts on "mutually agreeable" terms. *Id.*

In sum, although *Turtle Island Restoration Network* found the environmental language in the enabling statute to be the source of the discretion for the federal agency in that case, an environmental purpose need not be expressed in the enabling statute to trigger Section 7(a)(2) of the ESA. *NRDC v. Houston* demonstrates that a stated environmental purpose is not necessary if the action agency otherwise has discretion to act in such a way that could benefit the endangered and threatened species. Indeed, most federal agency actions would not be subject to the formal consultation process under Section 7(a)(2) if the ESA only applied

54

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> to agency actions where the agency was already
> compelled by statute to protect listed species.
> Furthermore, a narrow interpretation of the term
> "agency action" that only applies Section 7(a)(2) to
> actions carried out under environmental statutes would
> conflict with the broad reading of the term given by
> the United States Supreme Court and the Ninth Circuit.

*Id*. at 1171-72 (emphasis added).   *Turtle Island* and *NRDC v.*

*Houston* were applied to the challenged FEMA activities:

> Applying *Turtle Island Restoration Network* and *NRDC v.*
> *Houston* to the present case, the issue is whether the
> NFIA confers sufficient discretion on FEMA so that FEMA
> <u>could</u> implement the NFIP to benefit the Puget Sound
> chinook salmon, not whether FEMA <u>must</u> implement the
> NFIP to benefit the salmon. The fact that the NFIP is
> an insurance, not an environmental, program does not
> foreclose the agency's discretion to implement measures
> to benefit the salmon. One of the seven enumerated
> purposes of the NFIP authorizes FEMA to guide
> development away from locations threatened by flood
> hazards, see 42 U.S.C. § 4001(e)(2), which, in turn,
> would help preserve the natural floodplain functions
> that benefit salmon. This provision grants FEMA the
> discretion to act for the benefit of the salmon in the
> same way that the Bureau of Reclamation had discretion
> to adjust the water supply available to water rights
> holders to benefit salmon in *NRDC v. Houston*.
> Additionally, the NFIA states that FEMA "shall consult
> with other departments and agencies of the Federal
> Government ... in order to assure that the programs of
> such agencies and the flood insurance program
> authorized under this chapter are mutually consistent."
> 42 U.S.C. § 4024. This "shall consult" language not
> only gives FEMA discretion to consult, but appears to
> require FEMA to consult with other agencies, such as
> NMFS, to ensure that the NFIP is implemented in a
> manner that is "mutually consistent" with NMFS's
> programs. Accordingly, the Court holds that FEMA has
> discretion to act for the benefit of the Puget Sound
> chinook salmon in implementing the NFIP and thus
> consultation with the NMFS is ordered. However, because
> "the implementation of the NFIP" is a vague way to
> describe the agency action at issue, the Court examines
> the component parts of the NFIP to determine whether
> FEMA has discretion with respect to each part.

*Id*. at 1169-73 (emphasis in original).

The Coalition's theory of this case is that a suite of actions continuously undertaken by FEMA to "carry out" the NFIP encourages land development, which reduces available habitat to listed species, and therefore requires consultation. In addition to FEMA's mapping activities, Plaintiffs allege that FEMA's certification of community eligibility for the NFIP and monitoring of community compliance and enforcement with FEMA's criteria for eligibility encourage development in the floodplain. However, no case suggests that the mere allegation of a programmatic challenge excuses examination of the individual activities Plaintiffs allege to be in violation of the law.[9] *NWF v. NMFS* analyzed the NFIP component-by-component. *Id*. at 1173.

4. <u>Mapping Activities.</u>

Federal Defendants invoke *Karuk Tribe* to argue that FEMA's

---

[9] Federal Defendants suggest that a programmatic attack against an "apparatus established by the Executive Branch to fulfill its legal duties," rather than "specifically identifiable Government violations of law," raises serious justiciability issues. Federal Defendants cite *Allen v. Wright*, 468 U.S. 737, 759-60 (1984), in which the Supreme Court found that parents of African American public school children had no standing to sue the Internal Revenue Service for failing to adopt sufficient standards to deny tax-exempt status to racially discriminatory private schools. The Court reasoned whether IRS grants of exemption to private schools impacts racial composition of public schools was speculative and that permitting standing would "pave the way generally for suits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations. Such suits, even when premised on allegations of several instances of violations of law, are rarely if ever appropriate for federal-court adjudication." *Id*. at 740. But, that case concerned completely different theories of causation than are present here. Plaintiffs' standing, including their theories of causation, were examined and accepted for purposes of pleading in *Coalition for a Sustainable Delta v. FEMA*, 711 F. Supp. 2d 1152, 1160 (E.D. Cal. 2010). Federal Defendants have not moved for summary judgment on the issue of standing, and, as discovery has not yet closed, the record is insufficient to address standing on summary judgment *sua sponte*.

mapping activities only "acquiesce" in private parties' prior actions modifying the flood plain.  FEMA undisputedly does not "authorize" these modifications through any type of permit or license.  Instead, FEMA simply responds to completed modifications by adjusting its maps accordingly.  FEMA's actions are distinguishable from those in *Karuk Tribe, Western Watersheds*, and *CSPA.*  The affirmative action rule applied in those three cases barred application of the ESA to agency decisions <u>not</u> to do anything.  In *Western Watersheds*, BLM decided not to impose conditions on the diversion of water; in *CSPA*, FERC decided not to amend a license; and in *Karuk Tribe*, the BLM decided not to require a Plan.  By contrast, FEMA unquestionably takes action, pursuant to the NFIP, when it amends a map.

Another ground of distinction from *Karuk Tribe*, *CSPA*, and *Western Watersheds* exists.  Those cases evaluated whether the agency activity qualified as an "authorization" under 50 C.F.R. 402.02[10], while the plaintiffs here, as in *NWF v. FEMA,*

---

[10] 50 C.F.R. § 402.02 defines the term "action" to mean:

> all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas.  Examples included, but are not limited to:
>
> > (a) actions intended to conserve listed species or their habitat;
> >
> > (b) the promulgation of regulations;
> >
> > (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or
> >
> > (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02.

characterize FEMA's NFIP activities as "carrying out" an agency program.  *See* TAC at ¶ 25; *NWF v. FEMA*, 345 F. Supp. 2d at 1169. *Karuk* confirms that the "authorized" language of 50 C.F.R. § 402.02 only applies to an affirmative action such as issuing a license or permit.  *Karuk* in footnote 12, interprets the "carrying out" language from 50 C.F.R. § 402.02 to encompass only <u>challenges to the way an agency applies an existing standard</u>:

> While the Ranger may be able to alter the way he applies the standard "likely to cause significant disturbance of surface resources" to the benefit of species (resulting in more NOIs requiring a Plan, in connection with which the Ranger can demand changes in the intended private conduct), <u>his adoption and carrying out of the standard is not at issue here</u>. *Cf.* 50 C.F.R. § 402.02 (listing as "agency action" the promulgation of regulations and the carrying out of programs "intended to conserve listed species or their habitat").  <u>If it were, the holding in this case might be very different</u>. Rather, the Tribe seeks to force interagency consultation for NOIs that, we must assume, are properly deemed not Plan-worthy under the governing standard. *Cf. Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 979 (7th Cir. 2005) (holding section 7 consultation not required for ministerial acceptance of NOIs filed to take advantage of a previously-authorized general permit).

640 F.3d at 992 n.12.  *Karuk's* result would have been different if the challenge was to how the Ranger "carried out" the existing standard, because the agency's application of the "likely to cause significant disturbance of surface resources" standard to require preparation of a Plan <u>is</u> "affirmative action."  If the standard has been properly applied to deem an activity described in an NOI "not Plan-worthy," section 7 is not triggered, in part

because, absent a finding that the activity is "likely to cause significant disturbance," the Forest Service lacks authority to "approve" the exercise of pre-existing mining rights and therefore cannot possibly satisfy the affirmative action requirement.

Plaintiffs' challenge to the "ongoing implementation of the NFIP," Doc. 129 at 31, is a challenge to how FEMA is "carrying out" existing standards applicable to floodplain mapping. *See* TAC at ¶ 25.[11]  Plaintiffs focus on four regulatory provisions: 44 C.F.R. §§ 60.3, 64.3, 65.5 and 65.10.  Doc. 129 at 31.

Title 44, C.F.R. § 60.3 explains, among other things, that communities participating in the NFIP "shall ... require that all new construction and substantial improvements of" residential and non-residential structures within certain flood hazard zones identified on the community's FIRM "have the lowest floor (including basement) elevated to or above the base flood level...." § 60.3(c)(2)-(3).  This regulatory language pertains to all FEMA's mapping activities.

Section 64.3 describes the types of maps FEMA may prepare in connection with the sale of flood insurance and prescribes that certain types of maps shall be maintained for public inspection in particular public places.

---

[11] Plaintiffs specifically disclaim that they challenge the regulations themselves and cannot challenge FEMA's floodplain mapping activities as "authorizations," as they plainly do not involve the issuance of a permit, license, or related "permission."  Plaintiffs also describe their challenge as a challenge to the "structure" of the NFIP.  But, this is nothing more than a challenge to the regulatory framework itself, which is time-barred.

Section 65.5 specifically addresses the modification of flood hazard boundaries in response to the use of earthen fill to elevate areas above the base flood level:

> (a) Data requirements for topographic changes. **In many areas of special flood hazard** (excluding V zones and floodways) **it may be feasible to elevate areas with engineered earthen fill above the base flood elevation**. Scientific and technical information to support a request to gain exclusion from an area of special flood hazard of a structure or parcel of land that has been elevated by the placement of engineered earthen fill will include the following:
>
> > (1) A copy of the recorded deed indicating the legal description of the property and the official recordation information....
> >
> > (2) If the property is recorded on a plat map, a copy of the recorded plat indicating both the location of the property and the official recordation information....
> >
> > (3) A topographic map or other information indicating existing ground elevations and the date of fill. FEMA's determination to exclude a legally defined parcel of land or a structure from the area of special flood hazard will be based upon a comparison of the base flood elevations to the lowest ground elevation of the parcel or the lowest adjacent grade to the structure. If the lowest ground elevation of the entire legally defined parcel of land or the lowest adjacent grade to the structure are at or above the elevations of the base flood, FEMA will exclude the parcel and/or structure from the area of special flood hazard.
> >
> > (4) Written assurance by the participating community that they have complied with the appropriate minimum floodplain management requirements under § 60.3. This includes the requirements that:
> >
> > > (i) Existing residential structures built in the SFHA have their lowest floor elevated to or above the base flood;

60

1

2          (ii) The participating community has
           determined that the land and any existing or
3          proposed structures to be removed from the
           SFHA are "reasonably safe from flooding", and
4          that they have on file, available upon
           request by FEMA, all supporting analyses and
5          documentation used to make that
           determination;
6

7          (iii) The participating community has issued
           permits for all existing and proposed
8          construction or other development; and

9          (iv) All necessary permits have been received
           from those governmental agencies where
10         approval is required by Federal, State, or
           local law.
11

12     (5) If the community cannot assure that it has
       complied with the appropriate minimum floodplain
13     management requirements under § 60.3, of this
       chapter, the map revision request will be deferred
14     until the community remedies all violations to the
       maximum extent possible through coordination with
15     FEMA. Once the remedies are in place, and the
       community assures that the land and structures are
16     "reasonably safe from flooding," we will process a
       revision to the SFHA using the criteria set forth
17     in § 65.5(a). The community must maintain on file,
       and make available upon request by FEMA, all
18     supporting analyses and documentation used in
       determining that the land or structures are
19     "reasonably safe from flooding."
20

21                           ***

22     (7) A revision of floodplain delineations based on
       fill must demonstrate that any such fill does not
23     result in a floodway encroachment.

24     (b) New topographic data. A community may also
       follow the procedures described in paragraphs
25     (a)(1) through (6) of this section to request a
       map revision when no physical changes have
26     occurred in the area of special flood hazard, when
       no fill has been placed, and when the natural
27     ground elevations are at or above the elevations
       of the base flood, where new topographic maps are
28

                              61

more detailed or more accurate than the current
map.

***

(Emphasis added.)

Section 65.10(a) explains that "FEMA will only recognize in its flood hazard and risk mapping effort those levee systems that meet, and continue to meet, minimum design, operation, and maintenance standards that are consistent with the level of protection sought through the comprehensive flood plain management criteria...." Subsections (b) through (e) identify requirements for the design, operation, and maintenance of levee systems.

These regulations directly <u>permit</u> private parties to use artificial means to either elevate (e.g., through the use of fill) the lowest floor of covered structures above the base flood level or alter (e.g., by way of levee construction) the contours of the flood plain itself.[12]

The crux of this dispute is Plaintiffs' argument that FEMA has the discretion to carry out its floodplain mapping activities in a way that provides <u>alternative mechanisms</u> to protect the species. On this record, FEMA has exercised such discretion in other regions. For example, NMFS issued a jeopardy biological opinion and reasonable and prudent alternative ("RPA") addressing

---

[12] Plaintiffs allege that these regulations "are <u>structured</u> in a manner that encourages a third party to make physical alterations to the floodplain and then petition FEMA for a revision to the Hazard area." Doc. 129 at 31.  This is a challenge to the regulations themselves, which were last substantively amended in 1997.  Any such claim time-barred.

the impacts of the NFIP on listed salmonids in Puget Sound.  *See*

Exhibit B, Doc. 132-1.  That RPA required FEMA to process LOMCs

created by manmade alterations: "only when the proponent has

factored in the effects of the alterations on channel and

floodplain habitat function for listed salmon, and has

demonstrated that the alteration avoids habitat functional

changes, or that the proponent has mitigated for the habitat

functional changes resulting from the alteration with appropriate

habitat measures that benefit the affected salmonid populations."

*Id*. at 152.  FEMA is implementing these and other changes to its

mapping procedures to reduce impacts on salmonids in Puget Sound.

*See* Exhibit R, Doc. 144.

Given the existence in the regulatory framework of

sufficient discretion to accommodate the changes to FEMA's

mapping activities described above, this case is more like

*Washington Toxics* than any other of the cited cases.  As in

*Washington Toxics*, where the EPA retained authority to modify

and/or withdraw pesticide registrations, FEMA retains authority

to modify how and under what circumstances it will consider

allowing floodplain modifications in its mapping activities.

This "discretionary" action "directly or indirectly causes

modifications to the land and water."  50 C.F.R. §402.02(d).

Unlike *Karuk* and *Western Watersheds*, emphasizing that

private parties had pre-existing rights under separate statutes

to engage in the challenged activities (mining in *Karuk* and the

63

use of vested water rights in *Western Watersheds*), private parties have no underlying "right," granted by statute or regulation, to use artificial modifications to remove property or structures from flood hazard boundaries

The NFIP regulations permit landowners to exempt their property from the flood plain by artificially elevating it.  FEMA implements these regulations on a continuing basis by approving map changes to reflect fill activities.[13]  FEMA possess discretion to modify its implementation of the mapping regulations to benefit the species.  If it did not, the modifications made to implement the NFIP in Puget Sound would be unlawful.[14]  FEMA's

---

[13] This finding is consistent with *NWF v. NMFS*, which applied then-existing caselaw to FEMA's mapping activities as follows:

> FEMA argues that its mapping of a floodplain is "exceedingly ministerial," based solely on a technical evaluation of the base flood elevation. However, FEMA has used its discretion to map the floodplain in a way that allows persons to artificially fill the floodplain to actually remove it from its floodplain status, and thus from regulatory burdens. There is nothing in the NFIA authorizing, let alone requiring, FEMA to authorize filling activities to change the contours of the natural floodplain. Indeed, such regulations may be counterproductive to the enabling statute's purpose of discouraging development in areas threatened by flood hazards. As a result of FEMA's discretion in its mapping activities, FEMA must consult on its mapping regulations and its revisions of flood maps, to determine whether they jeopardize the continued existence of the Puget Sound chinook salmon. Because the NFIA requires FEMA to review flood maps at least once every five years to assess the need to update all floodplain areas and flood risk zones, 42 U.S.C. § 4101(e), (f)(1), the agency activity is clearly an ongoing one that is subject to the ESA's consultation requirements.

345 F. Supp. 2d at 1173.

[14] Federal Defendants argue that FEMA's alleged authority to amend the NFIP regulations does not trigger a duty to consult.  Plaintiffs respond by clarifying that they do not contend that the discretion to amend the NFIP regulations alone triggers the duty to consult.  Doc. 129 at 27-28. Plaintiffs concede that the ability to amend these regulations, without more, is insufficient to trigger the consultation duty.  *Id.* at 28.  Rather, the key here is that FEMA also retains discretion to modify its implementation of

floodplain NFIP ongoing mapping activity in the Sacramento-San Joaquin Delta is ongoing agency action and therefore not barred by the six-year statute of limitations.  Federal Defendants' partial motion for summary judgment that Plaintiffs' claims regarding FEMA's mapping activities are barred by the statute of limitations is DENIED.

> 5.    Other NFIP-Related Activities.

Although the Complaint focuses almost exclusively on specific examples related to FEMA's mapping activities, Plaintiffs also allege that development in the floodplain is encouraged by FEMA's implementation of its community eligibility criteria, monitoring of community compliance and enforcement based on these criteria, and implementation of its Community Rating System that provides discounts on flood insurance premiums to NFIP communities that go beyond the minimum NFIP eligibility criteria.  TAC at ¶¶ 73, 75-6.  Federal Defendants do not move for summary judgment as to Plaintiffs' claims concerning these activities.  They need not be addressed.

C.    FEMA's Argument that LOMCs Do Not Trigger a Duty to Consult Because They Have No Effect on Listed Species.

Section 7(a)(2)'s consultation requirement applies only to those actions "authorized, funded, or carried out" by Federal agencies, 50 C.F.R. § 402.02, that "may affect" listed species or

---

existing regulations to benefit the species.

65

critical habitat, *id.* § 402.14(a) (emphasis added).  "ESA section 7 requires that an agency considering action consult with either [FWS or NMFS] if the agency 'has reason to believe that an endangered species or a threatened species may be present in the area' affected by the proposed action, and 'implementation of such action will likely affect such species.'"  *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1091 (9th Cir. 2004) (quoting 16 U.S.C. § 1536(a)(3)).  If the agency action is environmentally neutral and will have no effect on listed species, the consultation requirement is not triggered.  *See S.W. Ctr.*, 100 F.3d at 1447-48;[15] *but see Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018-19 (9th Cir. 2009) (citing 51 Fed. Reg. at 19,949 for the proposition that "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement...").

FEMA contends that to the extent Plaintiffs' assert that FEMA's mapping activities violate ESA Section 7(a)(2), these claims fail because the individual mapping actions are "environmentally neutral."  For example, LOMCs do nothing more than revise or amend flood maps to reflect extant, on-the-ground conditions.  LOMC Validations simply identify the prior LOMCs

---

[15] This is not to be confused with the definition of "action" under the ESA, which includes actions designed to benefit species.  *See* 50 C.F.R. § 402.02 (the term "action" includes "actions intended to conserve listed species or their habitat").  An "action" will not trigger consultation if the action agency determines it will have no effect on the listed species.  *See S.W. Ctr.*, 100 F.3d at 1447-48

that remain in effect following the issuance of a new FIRM and "revalidates" previously-issued LOMCs.  An LOMC violation is not a new mapping action and does not authorize, fund, or carry out any projects that might have some future effect on listed species.  The same applies to LOMAs and LOMR-Fs, which correct the inadvertent inclusion of properties in the regulatory floodway depicted on a FIRM.  Likewise, LOMRs are issued as a result of updated flood hazard data that requires a modification of the FIRM.  *See* 44 C.F.R. §§ 65.4-65.6; Norton Decl., ¶ 6.b. FEMA may also issue a LOMR-F, which is a "modification of the SFHA shown on the FIRM based on the placement of fill outside the existing regulatory floodway."  44 C.F.R. § 72.2; Norton Decl., ¶ 6.c.  In both cases, the project or the placement of fill has already been completed at the time the LOMR or LOMR-F is issued.[16]

FEMA characterizes each of these determinations as "environmentally neutral," activities that could not possibly "affect" listed species.  Doc. 122 at 2.  Rather, FEMA maintains that the appropriate targets for ESA compliance action are the private individuals and local and state jurisdictions that

---

[16]  In contrast, FEMA may also issue a conditional LOMR or LOMR-F before the requesting party has taken an action that physically modifies the floodplain. Norton Decl., ¶ 8 & Ex. B.  In these circumstances, there is still "an opportunity to identify if threatened or endangered species may be affected by the potential project."  Norton Decl., Ex. B at 2.  As a result, FEMA's procedures provide that "[t]he CLOMR-F or CLOMR request will be processed by FEMA only after FEMA receives documentation from the requestor that demonstrates compliance with the ESA."  *Id.* at 3.  FEMA maintains that requests for LOMRs or LOMR-Fs do not provide the same opportunity to comment on the projects because map changes are issued only after the physical alterations have taken place.  Doc. 122 at 28-29.

1   actually completed the projects and "are required to comply with

2   the ESA independently of FEMA's process."  *Id*. at 29.

3       FEMA minimizes the programmatic nature of Plaintiffs'

4   challenge, which is not directed against individual mapping

5   actions themselves.  Plaintiffs maintain that FEMA's ongoing

6   administration of its floodplain mapping activities encourages

7   communities and developers to use fill or build levees to obtain

8   FEMA-issued LOMRs or LOMR-Fs, removing the covered properties

9   from the SFHA, relieving the property owners of the statutory

10  requirement for flood insurance.  TAC ¶¶ 70-72.  This is alleged

11  to encourage land filling and recovery which reduces the species'

12  critical habitat in the Delta.

13      *NWF v. FEMA* explains:

14          FEMA argues that its mapping of a floodplain is
            "exceedingly ministerial," based solely on a technical
15          evaluation of the base flood elevation. <u>However, FEMA
            has used its discretion to map the floodplain in a way</u>
16          <u>that allows persons to artificially fill the floodplain</u>
            <u>to actually remove it from its floodplain status, and</u>
17          <u>thus from regulatory burdens. There is nothing in the</u>
            <u>NFIA authorizing, let alone requiring, FEMA to</u>
18          <u>authorize filling activities to change the contours of</u>
            <u>the natural floodplain</u>. Indeed, such regulations may be
19          counterproductive to the enabling statute's purpose of
            discouraging development in areas threatened by flood
20          hazards. As a result of FEMA's discretion in its
            mapping activities, FEMA must consult on its mapping
21          regulations and its revisions of flood maps, to
            determine whether they jeopardize the continued
22          existence of the Puget Sound chinook salmon. Because
            the NFIA requires FEMA to review flood maps at least
23          once every five years to assess the need to update all
            floodplain areas and flood risk zones, 42 U.S.C. §
24          4101(e), (f)(1), the agency activity is clearly an
            ongoing one that is subject to the ESA's consultation
25          requirements.

26  345 F. Supp. 2d at 1173.

27

28

FEMA argues that this reasoning is "legally untenable," because "FEMA's floodplain mapping regulations do not authorize anyone to place fill, build levees, or construct any type of flood control projects anywhere."  Doc. 122 at 29.  *NWF v. FEMA* makes no such finding.  Rather, that case and Plaintiffs here emphasize how FEMA has used its discretion to permit persons to artificially (e.g., through filling activities) remove areas from the floodplain, which causes reduction in habitat.

Where, as here, the movant seeks summary judgment on a claim or issue on which the non-movant bears the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case."  *Soremekun*, 509 F.3d at 984.  "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'"  *Id.* (quoting *Anderso*n, 477 U.S. at 250 (1986)).  "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."  *Soremekun*, 509 F.3d at 984.

Plaintiffs submit Exhibit F to their Request for Judicial Notice, Docs. 131 & 132, excerpts from a May 2006 FEMA Biological Assessment ("2006 BA") regarding the potential impacts of FEMA's Federal Disaster Assistance programs on various listed species in

California.[17]  The 2006 BA explains that under the proposed action "**FEMA would provide funds to implement changes required by current building codes and standards or otherwise modify existing buildings.  Often, these changes have the effect of making the structure more resistant to damage in future events.**"

Typical activities include:

- **Making buildings more fire resistant (e.g., by replacing roofs and doors with fire-resistant materials) or safer during fires (e.g., by installing sprinkler and alarm systems);**

- **Installing bracing, shear panels, shear walls, anchors, or other features so that buildings are better able to withstand earthquake shaking or high wind loads;**

- **Modifying buildings to reduce the risk of damage during floods by elevating structures above the expected flood level or by flood-proofing;**

- **Modifying buildings to meet another need of a sub-grantee, such as with an improved action or an alternate action.**

**If a building is located in an identified floodplain and is substantially damaged, the NFIA requires that the building be elevated so that the lowest floor is at or above the base flood (100- year) elevation. Newly constructed buildings, such as those built to replace destroyed facilities must also meet this requirement, if located in floodplains. Structures can be elevated on extended foundation walls, piers, posts, columns, or compacted fill.** All materials used below the base flood elevation must be flood resistant. Utilities, such as exterior compressors, also must be elevated above the base flood elevation. A building also can be flood-proofed so that floodwaters can encounter it without causing damage to the structure or its contents. "Dry floodproofing" methods involve the installation of flood shields, water-tight doors and windows, earthen barriers, and pumping systems to prevent water from entering the structure. "Wet floodproofing" involves the installation of vents and flood-resistant materials so that water may enter and leave areas of the structure without causing damage. With both dry and wet

---

[17] This document is available at http://www.fema.gov/library/viewRecord.do?id=1966 (last visited May 18, 2011).

1    flood-proofing, utilities are modified, elevated, or
     relocated to prevent floodwaters from accumulating
2    within them. Buildings also may be upgraded to meet
     codes unrelated to damage from natural hazards, such as
3    upgrades required by changes in capacity or function,
     and upgrades necessary to meet the requirements of the
4    Americans with Disabilities Act.

5    Exhibit F at 3-3 (emphasis added).

6        Elsewhere in the 2006 BA, the potential impacts of these and

7    other activities are discussed:

8         Any activity that involves work in an area with
          sensitive resources, no matter what the intent, has the
9         potential to negatively effect those resources without
          careful planning. The proposed actions discussed in
10        Section 2 have the potential to impact salmon and
          steelhead through disturbing the breeding, feeding,
11        mating, and sheltering of these species by impeding or
          blocking passage; putting sediment; input of debris or
12        pollutants into waters; entraining fish; or otherwise
          harming the fish or negatively impacting their
13        environment. Impacts that could be expected from the
          proposed actions discussed in Section 2 could result in
14        the loss of habitat complexity and degradation of water
          quality. These effects include:
15

16        • introduction of sediment from a project site
            into the waterways from erosion or runoff;
17
          • loss of in-stream cover or resting places
18          through channel simplification, removal of large
            woody debris and rocks, or removal of riparian
19          canopy at the project site;

20        • loss of suitable gravel substrate through
            removal or burial with sediment;
21
          • decreases in water flow downstream from water
22          withdrawals or diversions at or above the site;

23        • barriers to fish passage from improperly
            designed stream crossings or other devices;
24
          • increases in water temperature from loss of
25          riparian shade; and

26        • introduction of pollutants to waterways from
            construction materials placed in the water, spills
27          or runoff.

28        Coho salmon, Chinook salmon, and steelhead all need
          very similar components and functions of complex

                                   71

freshwater habitats. The loss of essential habitat components and functions through human actions happens in many ways. Sedimentation and/or stream flow reductions can result in the loss of deep, cool water pools; reducing the available habitat that juvenile and adult salmonids can use for shelter or forage. Sediment can also smother the aquatic invertebrates that juvenile salmonids feed on or cement the substrate so that spawning cannot take placed. Loss of instream cover (i.e., large woody debris and rocks) reduces available shelter from predators. Loss of riparian canopy increases water temperature, causing stress and/or death for the salmonids and their forage species. <u>The introduction of pollutants may kill or stress salmonids and the species they feed on.</u> Lowered water flows, as the result of damming or diverting water, may delay migration, dry out sections of the stream channel stranding fish, and fragment habitat (Berggren and Filardo 1993; Chapman and Bjornn 1969; Reiser and Bjornn 1979). Alternations to a channel may result in a loss of complex habitat, shelter, shade, and availability of forage.

*Id.* at 5-1 (emphasis added).

This is sufficient to create a dispute as to whether the actions of private parties, such as "[m]odifying buildings to reduce the risk of damage during floods by elevating structures above the expected flood level," *see id.* at 3-3, have impacts on listed species.

However, the 2006 BA concerned a different FEMA program, namely funding to prepare for and/or rebuild after natural disasters. That the direct provision of funds to elevate structures above flood level "causes" such activities to take place is undisputed. Here, the issue is whether FEMA's administration of the NFIP in a manner that permits artificial activities to modify the floodplain so as to exclude structures from its boundaries causes persons to engage in such activities. NMFS's biological opinion on FEMA's implementation of the NFIP in

1    Puget Sound directly addressed this issue:

2           The regulatory function of the NFIP recognizes
            placement of fill in floodplains for two purposes – 1)
3           to place habitable structures at or above the elevation
            of the 100 year flood to reduce risk of loss of life
4           and property, and 2) to remove areas from the
            floodplain altogether. Where the NFIP is in effect,
5           barring local regulations that preserve floodplain
            function, the eventual effect of operation of the
6           regulation to place fill, is to allow more development
            to be "safely" placed in the floodplain. By its very
7           purpose, the NFIP reduces available floodplain storage
            of water, in particular the slower velocity, more
8           shallow volumes of water of the "flood fringe, which
            juvenile salmonids rely on for their survival. The NFIP
9           allows floodplains to be filled with development up to
            the point that the 100-year or base flood is
10          constrained to the point of increasing the elevation of
            that flood by one foot. By its stated terms, the NFIP
11          functions to restrict development only when the volume
            of concentrated water to be conveyed is so constrained
12          by floodplain development that the floodway is no
            longer sufficient for "safe" conveyance of floodwaters.
13          Thus, with each successive flood event, fish within the
            flooding system will have less floodplain refugia, and
14          more volume and velocity of water within the main
            floodway, decreasing their chances for survival, and
15          among those that do survive, their fitness for future
            developmental stages.
16

17   Exhibit B, Doc. 132, at 145.  This finding about NFIP effects on
18
     the same listed species in another area creates a dispute as to
19
     whether FEMA's mapping activities indirectly cause development to
20
     occur in NFIP participating areas, with resulting effect on the
21
     species.
22
          FEMA's motion for summary judgment on the ground that its
23
     map revision process has no effect on Listed Species is DENIED.
24

25

26

27

28

                                73

D.   Plaintiffs' Challenge is Not Barred by 42 U.S.C. § 4101.

Section 4104 of the NFIA requires FEMA to follow detailed procedures when issuing a FIRM or FIRM amendment that establishes or modifies the base flood elevation ("BFE").  *See* 42 U.S.C. § 4104; 44 C.F.R. pt. 67.  FEMA must first "propose [BFEs for a community] by publication for comment in the Federal Register, by direct notification to the chief executive officer of the community, and by publication in a prominent local newspaper." 42 U.S.C. § 4104(a).  FEMA must also "publish notification of flood elevation determinations in a prominent local newspaper at least twice during the ten-day period following notification to the local government."  *Id.* § 4104(b); *see also* 44 C.F.R. § 67.4.

The community, and any owner or lessee of real property in the community who believes his property rights will be adversely affected by the proposed BFEs, may file an appeal within 90 days after the second newspaper publication.  42 U.S.C. § 4104(b), (e).  "The sole basis for such appeal shall be the possession of knowledge or information indicating that the elevations being proposed by [FEMA] with respect to an identified area having special flood hazards are scientifically or technically incorrect, and the sole relief which shall be granted" is modification of the proposed elevations.  *Id.*; 44 C.F.R. §§ 67.5-67.6.

"Any appellant aggrieved by any final determination of [FEMA] upon administrative appeal, as provided by [42 U.S.C. §

74

4104], may appeal such determination to the United States district court for the district within which the community is located not more than sixty days after receipt of notice of such determination."  42 U.S.C. § 4104(g).  The scope of judicial review "shall be as provided" in the Administrative Procedure Act ("APA").  *Id*.  The agency's final flood elevation determinations "shall be effective" pending judicial review "unless stayed by the court for good cause shown."  *Id*.; *see* 44 C.F.R. § 67.12.

FEMA points out that 14 of the 17 LOMRs mentioned in Plaintiffs' Complaint were subject to the notice and administrative appeal process prescribed by the NFIA.  Norton Decl., ¶¶ 9.f, 10.  FEMA argues that Plaintiffs' present challenge is barred because the NFIA's administrative and judicial review provisions are exclusive and preclude Plaintiffs from bringing untimely challenges under the ESA's citizen suit provision.  In support of this argument, FEMA cites *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), in which consumers of dairy products sought judicial review under the APA of milk market orders issued by the Secretary of Agriculture pursuant to the Agricultural Marketing Agreement Act ("AMAA").  The APA provides for judicial review of final agency action except to the extent other statutes preclude review.  *See* 5 U.S.C. § 701(a)(1).  In the AMAA, Congress created a detailed mechanism by which milk <u>handlers</u> can participate in the development of market orders and seek administrative and judicial

review.  *Block*, 467 U.S. at 346-47.  "Nowhere in the Act,
however, is there an express provision for participation by
<u>consumers</u> in any proceeding."  *Id*. at 347 (emphasis added).

   The Supreme Court held that the detailed statutory scheme
precluded consumers from challenging marketing orders under the
APA.  *Id*. at 353. "Whether and to what extent a particular
statute precludes review is determined not only from its express
language, but also from the structure of the statutory scheme,
its objectives, its legislative history, and the nature of the
administrative action involved."  *Id*. at 345.  Although there is
a presumption favoring judicial review of agency action, it "is
just that -- a presumption.  This presumption, like all
presumptions used in interpreting statutes, may be overcome by
specific language or specific legislative history that is a
reliable indicator of congressional intent."  *Id*. at 349.
"[W]hen a statute provides a detailed mechanism for judicial
consideration of particular issues at the behest of particular
persons, judicial review of those issues at the behest of other
persons may be found to be impliedly precluded."  *Id*.  The
complex statutory scheme in the AMAA made clear "Congress'
intention to limit the classes entitled to participate in the
development of market orders," *id*. at 346, and the absence of any
express provision for participation by consumers "is sufficient
reason to believe that Congress intended to foreclose consumer
participation in the regulatory process," *id*. at 347.

> Had Congress intended to allow consumers to attack
> provisions of marketing orders, it surely would have
> required them to pursue the administrative remedies
> provided in the [AMAA] as well.  The restriction of
> administrative remedy to handlers strongly suggests
> that Congress intended a similar restriction of
> judicial review of market orders.

*Id*.  The Supreme Court concluded that "[t]he structure of this Act implies that Congress intended to preclude consumer challenges to the Secretary's market orders."  *Id*. at 352-53.

FEMA argues that Congress' intent to limit the class of persons who may challenge FEMA's flood elevation determinations "is even more unequivocal than in *Block*," because "Section 4104 of the NFIA provides only for the participation of affected communities and landowners in the regulatory process leading to the determination or modification of flood elevation levels, 42 U.S.C. § 4104(a)-(b), and limits the availability of administrative review to those participants."  Doc. 122 at 32.

FEMA's argument is misplaced for several reasons.  First, Plaintiffs do not challenge the validity (i.e., the accuracy) of FEMA's elevation determinations in the LOMCs discussed in the Complaint.  The administrative appeal provisions and statute of limitations in 42 U.S.C. § 4104 are limited to a challenge by a community, landowner, or leaseholder to FEMA's elevation determinations based on the submission of relevant technical information.  42 U.S.C. § 4104(a)-(b).  These provisions do not apply to a challenge to an agency's failure to consult under section 7 of the ESA with respect to an ongoing agency action.

77

Plaintiffs have no standing to directly challenge any LOMC discussed in the complaint.

Ninth Circuit precedent belies any preclusive effect of § 4104. *Washington Toxics*, 413 F.3d at 1033-34, holds that the doctrines of exhaustion and primary jurisdiction are inapplicable in a section 7 challenge to EPA's failure to consult regarding its registration of certain pesticides that may kill or injure, or affect future behavior and reproductive success of listed salmonids. *Id*. at 1034. There, EPA argued that "administrative exhaustion or primary jurisdiction under FIFRA applies ... , and that the district court should first have required the plaintiffs to exhaust FIFRA remedies before entering an injunction." *Id*. at 1033. Under 7 U.S.C. §§ 136d(c) and 136(l) of FIFRA, EPA may suspend the registration of any pesticide without observing the usual procedural requirements if it determines the pesticide creates "an unreasonable hazard to the survival of a [listed] species...." *Id*. In addition, under FIFRA, any interested person can petition EPA for a cancellation of a pesticide registration. *Id*. (citing 40 C.F.R. § 154.10).

The Ninth Circuit rejected EPA's exhaustion argument, holding that "[n]either FIFRA nor the ESA, however, suggest any legislative intent to require exhaustion of the FIFRA remedy before seeking relief under the ESA." *Id*. "[T]he mere fact that FIFRA recognizes EPA authority to suspend registered pesticides to protect listed species does not mean that FIFRA remedies trump

those Congress expressly made available under [the] ESA, or that

FIFRA provides an exclusive or primary remedy.  The scheme of the

two statutes suggests the exact opposite."  *Id*. at 1034.  Rather

the "different and complimentary purposes" of FIFRA and the ESA

"leads us to conclude that an agency cannot escape its obligation

to comply with the ESA merely because it is bound to comply with

another statute that has consistent, complimentary objectives."

*Id. at* 1032.

Here, as in *Washington Toxics*, § 4101's administrative

review procedures reveal no legislative intent to require

exhaustion of the NFIA's procedures prior to an ESA challenge.

FEMA's motion for partial summary judgment on the ground that

Plaintiffs' claims are barred by the administrative review

procedures set forth in 42 U.S.C. § 4104 is DENIED.

E.   Is FEMA's Issuance of Flood Insurance a Non-Discretionary
     Act Not Subject to Section 7(a)(2) under *Home Builders*?

Federal Defendants argue that FEMA's issuance of flood

insurance is a non-discretionary act not subject to Section 7

under *Home Builders*.  The Eleventh Circuit explains *Home Builders*

in *Florida Key Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008):

> In *National Association of Home Builders*, the Supreme
> Court considered the interplay between the seemingly
> conflicting mandates of the Clean Water Act ("CWA") and
> the ESA. The CWA established the National Pollution
> Discharge Elimination System ("NPDES"), which is
> "designed to prevent harmful discharges into the
> Nation's waters." *Nat'l Ass'n of Home Builders*, 127
> S.Ct. at 2525. Although the Environmental Protection
> Agency ("EPA") initially administers the NPDES

permitting system for each state, it must transfer that permitting authority to a state upon application and satisfaction of nine statutory criteria. *Id*. Those criteria test the authority under state law of the would-be administering agency to carry out the NPDES program. *Id*. at 2525 & n. 2. The respondents before the Court argued that the EPA has discretion to consider listed species in making an NPDES transfer decision. *Id*. at 2537. The Court rejected the argument, stating that "[n]othing in the text of [the CWA's operative provision] authorizes the EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application." *Id*. Additionally, the Court noted that "to the extent that some of the [CWA] criteria may result in environmental benefits to marine species, there is no dispute that [the state at issue] has satisfied each of those statutory criteria." *Id*. In other words, although the CWA "requires the EPA to consider whether [a state] has the legal authority to enforce applicable water quality standards, ... the permit transfer process does not itself require scrutiny of the underlying standards or of their effect on marine or wildlife." *Id*. at 2537 n. 10.

*Id*. at 1142.  *NWF v. FEMA*[18] found that FEMA's issuance of flood insurance was a nondiscretionary act:

FEMA has no discretion to deny flood insurance to a person in a NFIP-eligible community. *See* 42 U.S.C. § 4012(c) (requiring FEMA to provide flood insurance to communities which have "evidenced a positive interest in securing flood insurance coverage under the flood insurance program" and have "given satisfactory assurance that ... adequate land use and control measures will have been adopted ... which are consistent with the comprehensive criteria for land management and use developed" under 42 U.S.C. § 4102). As a result, FEMA has no obligation to consult with NMFS regarding the actual sale of flood insurance.

345 F. Supp. 2d at 1174.

---

[18]Even though *NWF v. FEMA* was decided before *Home Builders*, the regulation at issue in *Home Builders* was there applied, namely 50 C.F.R. § 402.03 (agency actions are subject to Section 7(a)(2)'s consultation requirements only if "there is discretionary Federal involvement or control") and 50 C.F.R. § 402.16 (requiring re-initiation of consultation where "discretionary Federal involvement or control over the action has been retained or is authorized by law").  *See* 345 F. Supp. 2d at 1169.

Section 4012(c) provides:

> (c) Availability of insurance in States or areas
> evidencing positive interest in securing insurance and
> assuring adoption of adequate land use and control
> measures
>
> The Director shall make flood insurance available in
> only those States or areas (or subdivisions thereof)
> which he has determined have--
>
>> (1) evidenced a positive interest in securing
>> flood insurance coverage under the flood insurance
>> program, and
>>
>> (2) given satisfactory assurance that by December
>> 31, 1971, adequate land use and control measures
>> will have been adopted for the State or area (or
>> subdivision) which are consistent with the
>> comprehensive criteria for land management and use
>> developed under section 4102 of this title, and
>> that the application and enforcement of such
>> measures will commence as soon as technical
>> information on floodways and on controlling flood
>> elevations is available.

(Emphasis added.)   42 U.S.C. § 4102 in turn directs FEMA to

develop:

> ....comprehensive criteria designed to encourage, where
> necessary, the adoption of adequate State and local
> measures which, to the maximum extent feasible, will"
>
> (1) constrict the development of land which is exposed
> to flood damage where appropriate,
>
> (2) guide the development of proposed construction away
> from locations which are threatened by flood hazards,
>
> (3) assist in reducing damage caused by floods, and
>
> (4) otherwise improve the long-range land management
> and use of flood-prone areas,
>
> and he shall work closely with and provide any
> necessary technical assistance to State, interstate,
> and local governmental agencies, to encourage the
> application of such criteria and the adoption and

81

enforcement of such measures.

*Id*. at 4102(c).

Pursuant to § 4102, FEMA promulgated detailed requirements for NFIP-participating communities in 44 C.F.R. § 60.3, which, among other things, require communities to review all proposed development for flood danger and take certain corrective actions to minimize the potential for flood damage in flood-prone areas. One of the mechanisms employed by Section 60.3 compels the community to require all new construction and substantial improvements to existing structures within certain flood hazard zones be elevated to or above the base flood level.  44 C.F.R. 60.3(c)(2)-(3).

42 U.S.C. § 4012 provides that FEMA "<u>shall</u> make flood insurance available in only those States or areas (or subdivisions thereof)" which have, among other things, "evidenced a positive interest in securing flood insurance coverage under the flood insurance program" and have "given satisfactory assurance that ... adequate land use and control measures will have been adopted ... which are consistent with the comprehensive criteria for land management and use" set forth in 44 C.F.R. § 60.3.  Plaintiffs concede the mandate that FEMA "<u>must make flood insurance available</u> to participating communities" that satisfy the eligibility criteria means what it says, but argue that this does not mean FEMA has no discretion to place additional conditions on the insurance to qualify for coverage.  Doc. 129 at

38.  That FEMA hypothetically could amend the conditions for eligibility is irrelevant to resolution of this issue.  It is not disputed that "FEMA [] is charged with developing [the eligibility] criteria and enjoys broad discretion in so doing." *Fla. Key Deer*, 522 F.3d at 1142.  However, once the then-governing eligibility criteria[19] have been satisfied, the issuance of flood insurance to qualified applicants is <u>mandatory</u>, and, under *Home Builders*, is an act not subject to section 7 consultation.  To the extent Plaintiffs suggest that FEMA may modify the terms of the policies themselves to add additional conditions upon the issuance of insurance above and beyond those included in the regulatory eligibility criteria, any such argument fails.  The cannon of *expressio unius est exclusio alterius* applies to preclude inclusion of additional eligibility criteria omitted from the regulation itself.  *Cf.  Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002) (listing in Fed. R. Civ. Pro. 9(b) of certain actions requiring heightened pleading precludes application of the heightened standard to actions not listed); *Boudette v. Barnette*, 923 F.2d 754, 756-57 (9th Cir. 1991) (noting that the *expressio unius* canon "creates a presumption that when a statute designates certain ... manners of operation, all omissions should be understood as exclusions").

---

[19] It is also undisputed that FEMA retains ongoing authority to amend the eligibility criteria.  As discussed above, *supra* at note 13, Plaintiffs concede that FEMA's authority to amend the NFIP regulations does not, on its own, trigger a duty to consult.

1   FEMA's motion for partial for summary judgment that its

2   issuance of flood insurance to eligible applicants is non-

3   discretionary under *Home Builders* is GRANTED.

4

5                           VI. <u>CONCLUSION</u>

6       For the reasons set forth above Federal Defendants' motion

7   for partial summary judgment is GRANTED IN PART AND DENIED IN

8   PART as follows:

9       (1)  The six year statute of limitations does not bar

10  Plaintiffs' challenge to FEMA's ongoing mapping activities under

11  the NFIA.  The "ongoing activity" exception to the statute of

12  limitations has spawned a wealth of arguably contradictory

13  caselaw.  However, the balance of authority suggests that,

14  although FEMA's individual mapping actions are taken in response

15  to the actions of third parties, each such mapping action is an

16  "affirmative action" that collectively has the potential to

17  encourage third parties to fill and/or build levees in the Delta

18  floodplain.  To the extent the cumulative effect of such

19  activities threatens the continued existence of the species and

20  its habitat is subject to proof.  Whether or not FEMA's mapping

21  activities in the Delta actually do encourage such filling and

22  leveeing activities is a disputed material fact that cannot be

23  resolved on summary judgment.

24      (2) Likewise, whether FEMA's issuance of LOMCs and related

25  mapping activities actually impacts the Listed Species is a

1   disputed issue of fact that cannot be resolved on summary

2   judgment.  The ESA documents produced in connection with FEMA's

3   administration of the NFIP in Puget Sound are sufficient to

4   create a dispute of material fact on this issue.

5       (3)  Plaintiffs' challenge is not barred by the procedures

6   set forth in 42 U.S.C. § 4101, which provide for administrative

7   review of individual mapping actions.  These procedures do not

8   preclude the type of programmatic ESA challenge brought here.

9       (4)  Finally, FEMA's issuance of flood insurance is not

10  subject to ESA Section 7 consultation under *Home Builders*.  Once

11  the minimum eligibility requirements are satisfied, FEMA is

12  required to issue flood insurance to the eligible party and

13  retains no discretion to further modify the terms and conditions

14  of the policies.

15      Plaintiffs shall submit a proposed form of order consistent

16  with this memorandum decision within five (5) days following

17  electronic service.

18  SO ORDERED
    Dated August 19, 2011

19                                   /s/ Oliver W. Wanger
                                     United States District Judge

85